Mary G. RODGERS

v.

Robert K. BERGER et al.

Civ. A. No. 76–2068–F.

United States District Court,
D. Massachusetts.

Aug. 22, 1977.

Jeffrey M. Freedman, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for plaintiff.

William J. Murray, Murray, DiSanti & Schubert, West Springfield, Mass., for defendants.

## OPINION

FREEDMAN, District Judge.

This action was brought pursuant to the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1985, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The complaint alleges that defendants, under color of state law, have deprived plaintiff of rights, privileges and immunities secured by the Constitution and laws of the United States, particularly her property rights and right to equal protection of the laws under the Fourteenth Amendment. Specifically, she asserts that defendants discriminated against her by requiring that she, for reasons of maternity, take an extended leave of absence of one year, and then treating that leave of absence as a break in service so as to wipe out all prior service acquired for purposes of tenure. Defendants now seek to terminate plaintiff's employment. Plaintiff also claims that such a policy discriminates against her on the basis of sex because it treats pregnancy differently than other medical disabilities.

Plaintiff sought preliminary and permanent injunctive relief against the termination, as well as declaratory relief and damages on her behalf and on behalf of the class of similarly situated Chicopee school teachers. She subsequently waived her request to have the action certified as a class action, as well as her request for damages except for attorneys' fees.

A hearing was held before this Court on August 4, 1976, on the issue of preliminary relief. As a result of that hearing, the parties agreed by written stipulation that plaintiff would "be granted all the rights and privileges of a [tenured] teacher" pending the Court's determination of the case on the merits. A hearing with such a final disposition in mind was eventually held on June 23, 1977, at which time testimony was heard and evidence was presented pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. Since then the Court has considered at length the evidence, the numerous issues involved, and the relevant case law. As a result, I am of the opinion that the Court must rule in favor of plaintiff. The Court's reasoning is hereinafter set forth.

The material facts of the case are not in dispute and have been stipulated. Plaintiff holds a Bachelor of Arts degree and a Masters degree in English Literature. She has a teaching certificate from the Massachusetts Department of Education, certifying her to teach English. In September, 1971, she was employed as a teacher by the Chicopee School Committee. Thereafter, she taught in the Chicopee Public School System continuously from September, 1971, through June, 1973, thus teaching the entire 1971–72 and 1972–73 academic years. Before the beginning of the 1973–74 school year, plaintiff learned that she was pregnant and that her baby was due in late December, 1973, or January, 1974. The collective bargaining agreement then in effect between the Chicopee Teachers Association and the Chicopee School Committee contained Article XIX, which provided in pertinent part:

*EXTENDED LEAVES OF ABSENCE*

\* \* \* \* \* \*

D. A teacher who is an expectant mother will apply for a leave of absence five (5) months before the expected birth for a period of at least one (1) year after termination of pregnancy. If the expiration date of said leave occurs during the school year, the request may include addi-

tional time until the beginning of the next school year. Any teacher who knows prior to the opening of the school year that she will be required to comply with the provisions expressed in the sentence above, before December 1, will not be allowed to start the school year as a teacher. Such teacher will be allowed to return to the school system in accordance with the schedule stated in sentence one of this paragraph.

\* \* \* \* \* \*

J. All benefits to which the teacher was entitled at the time his leave of absence commenced, including unused accumulated sick leave, will be restored to him upon his return, and he will be assigned to the same position which he held at the time said leave commenced, if available, or, if not to a substantially equivalent position.

Pursuant to Article XIX, plaintiff was required to and did apply for and take a maternity leave for the entire 1973–74 academic year. In September, 1974, she returned to work as a teacher in the Chicopee Public School System and taught continuously during the 1974–75 and 1975–76 academic years. In a letter dated December 10, 1975, plaintiff's counsel advised Chicopee Public Schools Superintendent Dr. John Luke of plaintiff's belief that, since the 1974–75 academic year was her third year of service in the Chicopee Public Schools, she was at the time of that letter currently serving as a tenured teacher, regardless of the fact that the School Committee was still treating her as if she had not attained that status.[1] After discussing briefly the reasons for plaintiff taking that position, plaintiff's counsel closed by demanding that the Committee acknowledge her tenure.

In a letter dated March 30, 1976, the Superintendent informed plaintiff that, as part of a general staff reduction which included all non-tenure teachers, plaintiff's employment with the Chicopee School Committee would be terminated at the close of the academic year ending June, 1976. At the March 31, 1976 meeting of the School Committee, although a motion was made that plaintiff be granted tenure, the Committee voted to table that motion. On or about April 23, 1976, plaintiff filed with the Massachusetts Commission Against Discrimination (MCAD) and the Equal Employment Opportunity Commission (EEOC) a charge of discrimination based upon sex under Title VII of the Civil Rights Act of 1964. Pursuant to statute, the EEOC stayed the enforcement proceedings pending the determination by the local enforcement agency, the MCAD. Thereafter, by letter, the MCAD notified counsel for all parties that it had suspended proceedings in plaintiff's case pending a decision in this Court of plaintiff's complaint filed pursuant to 42 U.S.C. §§ 1983 and 1985. On August 10, 1976, the Department of Justice sent plaintiff a "right to sue" letter, notifying her of her right to institute a civil action under Title VII against the Chicopee School Committee.

As already discussed, pending the outcome of the instant case, plaintiff served as a teacher in the Chicopee Public Schools for the 1976–77 academic year, pursuant to a written stipulation.

Defendants have moved to dismiss plaintiff's complaint pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. A Rule 12(b)(2) motion, i. e., a motion to dismiss for lack of jurisdiction over the person, appears inappropriate here. However, in view of the fact that the motion itself requests that the action be dismissed for lack of jurisdiction over the subject matter, the Court will look upon this contradiction as an oversight by defendants and treat that motion as one brought under Rule 12(b)(1).

In their arguments for and against the above mentioned motions, and indeed throughout the discussion of the issues found in this case and the statutes and case law which will lead this Court to its ulti-

---

1. Massachusetts law provides that a teacher is entitled to the status of a tenured teacher if that person is employed by a school committee after having "served in its public schools for the three previous consecutive school years." Mass.Gen.Laws c. 71, § 41.

mate determination, both plaintiff and defendants have dealt with plaintiff's section 1983 claim and Title VII claim as if they are one and the same, conveniently extracting from the two different areas of law that control those claims whatever is most convenient for their respective positions. However, the task of reaching a final decision in this case is not that simple. The nature of plaintiff's section 1983 and Title VII claims, and the manner in which the law governing them has developed, requires that this Court deal with them separately.

As general grounds for their 12(b)(1) motion, defendants argue that plaintiff has not exhausted her contractual administrative remedies as expressed in the grievance and arbitration provisions of the collective bargaining agreement, and also that plaintiff's claims before the MCAD and EEOC should serve to bar this Court from having jurisdiction over the instant matter. Defendants point out that the collective bargaining agreement provides for a specific grievance procedure. That procedure is comprised of four "levels", and essentially involves filing grievances at those levels, with each successive level being the one to which an aggrieved person resorts if dissatisfied with a previous determination. (Thus, under the agreement, a grievance would (1) be discussed with a principal or designee, then be filed with (2) the Superintendent of Schools, (3) the School Committee, and eventually (4) the American Arbitration Association.)

█ Because I am of the opinion that this Court is barred from considering at least part of plaintiff's Title VII claim, I shall deal with that portion of the case before proceeding to the section 1983 aspect. The case law dealing with Title VII supports the position that, because the remedy afforded by Title VII is supplemental and "exists apart from analogous remedies provided by contract or by federal or state law," it is unnecessary for a plaintiff to exhaust grievance and arbitration proceedings available under a collective bargaining agreement before bringing an action in federal court. *Rios v. Reynolds Metal Compa-*

*ny,* 467 F.2d 54, 57 (5th Cir. 1972). *See, e. g., Hardison v. Trans World Airlines,* 375 F.Supp. 877, 880 (W.D.Mo.1974) ("plaintiff can choose to proceed under Title VII without resorting to grievance procedures at all"); *Parmer v. National Cash Register Company,* 346 F.Supp. 1043, 1049 (S.D.Ohio 1972); *Reese v. Atlantic Steel Company,* 282 F.Supp. 905, 906 (N.D.Ga.1967). Although it is clear under the law that a person claiming to be aggrieved by a violation of Title VII may not seek relief in federal court until he has exhausted prescribed administrative remedies, *Love v. Pullman Company,* 404 U.S. 522, 523, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972), apparently what is meant by that requirement is that the individual must first pursue his or her remedies before the EEOC. The record here indicates that, by virtue of the fact that she had sought redress with the MCAD and EEOC, and had received and acted upon the EEOC's statutory notice of the right to sue, plaintiff properly resorted to those remedies before filing suit with this Court. Therefore, this Court is not barred from hearing plaintiff's Title VII claim on the ground that she did not exhaust the necessary administrative remedies.

█ In addition to their exhaustion argument, defendants assert that this Court is barred from considering plaintiff's Title VII claim because plaintiff failed to comply with the jurisdictional requirement of section 706(d) of that Title. 42 U.S.C. § 2000e–5(e). That section provides in pertinent part:

A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . .

It is defendants' position that, since plaintiff alleges an unlawful employment practice that occurred in September, 1973, when she was required to take a maternity leave, she did not comply with the above section because her charge of employment discrimination was not filed with the MCAD or EEOC until April 23, 1976. Defendants are correct in their assertion that the timely filing of a charge of an unlawful employ-

ment practice is a statutory jurisdictional prerequisite to the maintenance of a Title VII action. *Alexander v. Gardner-Denver Company,* 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Therefore, the issue that arises at this point in the determination of plaintiff's case is whether she filed her Title VII claim with the EEOC within the statutory one hundred and eighty days after the occurrence of an alleged unlawful employment practice. As support for their position that plaintiff did not, defendants point out the case of *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). In that case respondent Evans had been employed by United Air Lines as a flight attendant. During her initial time of employment, United had a policy of refusing to allow female flight attendants to be married. Thus, when Evans married in 1968, she was forced to resign. As the Supreme Court pointed out in its opinion, it was later decided in *Sprogis v. United Air Lines,* 444 F.2d 1194 (7th Cir.), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971), that such a resignation violated Title VII. Respondent Evans was not a party to that case, however, and did not file a claim with the EEOC in 1968 within 90 days of her termination.[2] In November, 1968, United entered into a new collective bargaining agreement which did away with the "no marriage" rule and provided for reinstatement of certain flight attendants whose jobs had been terminated as a result of it. Evans was not among those covered by that agreement, and attempts by her to be reinstated were unsuccessful. Eventually, on February 16, 1972, she was hired as a new employee. For seniority purposes, she was thereupon treated as though she had not previously been employed by United. Her informal requests to receive credit for her pre-1972 seniority were denied and, as a result, Evans sought relief in federal court.

The Supreme Court stated in *Evans* that since respondent had not filed her claim with the EEOC within the required statutory period, a claim based on the alleged discriminatory act that took place in 1968 was barred. Apparently recognizing this fact, Evans argued, however, that by refusing to credit her with pre-1972 seniority, United was guilty of a present, continuing violation of Title VII and her claim was therefore timely. As support for her argument that the seniority system illegally discriminated, she asserted that it treated her "less favorably than males who were hired after her termination in 1968 and prior to her re-employment in 1972" and that it gave "present effect to the past illegal act and therefore perpetuate[d] the consequences of forbidden discrimination." 431 U.S. at 557, 97 S.Ct. at 1888.

The Supreme Court was unpersuaded by Evans' assertions. While it agreed that the seniority system gave present effect to a past act of discrimination, it reasoned that "United was entitled to treat that past act as lawful after respondent failed to file a charge of discrimination" within the statutorily prescribed time period. *Id.* The Court added:

A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

*Id.* This conclusion having been reached, what remained for the Court's consideration was whether any present violation existed in respondent's case. It decided there was no such violation. The Court characterized the seniority system as "neutral in its operation," since respondent had

not alleged that the system discriminates against former female employees or that it treats former employees who were discharged for a discriminatory reason any differently than former employees who

2. The time allowed for filing a claim with the EEOC was expanded to 180 days by amendment to Title VII in 1972. *See* 86 Stat. 103, 105.

resigned or were discharged for a non-discriminatory reason.

*Id.* The Court then concluded that

a challenge to a neutral system may not be predicated on the mere fact that a past event which has no present legal significance has affected the calculation of seniority credit, even if the past event might at one time have justified a valid claim against the employer. A contrary view would substitute a claim for seniority credit for almost every claim which is barred by limitations.

*Id.* at 560, 97 S.Ct. at 1890.

Plaintiff has failed to see the significance of *Evans* and the reason for which it controls this case. Granted, the instant action differs from *Evans* in that plaintiff herein was never terminated from her employment as was Ms. Evans and therefore was not placed in the position of being rehired or reinstated upon her return from maternity leave. That fact, however, is immaterial. The basic rationale of the Court in *Evans* must be applied to the instant case because the issues presented in the two actions are in fact the same. The wording of section 706(d) of Title VII and the clear language in *Evans* leaves this Court no choice but to conclude that, because plaintiff herein did not file a timely charge with the EEOC concerning the alleged unlawful employment practice that occurred when she was required to take maternity leave in September, 1973, she may not now receive from this Court a determination as to whether that act was or was not violative of Title VII. In the words of *Evans,* that alleged act now has "no present legal consequences." Thus, the only Title VII issue that is now before the Court is this: Given the fact that plaintiff, having failed to file with the EEOC, within the statutorily permitted time period, a charge of an unlawful employment practice arising from her being forced to take a maternity leave, is barred from now raising such a claim, and given the fact that she returned to her teaching position when she was allowed to do so under the then controlling collective bargaining agreement and has been employed each year in that capacity since her return, does defendants' refusal to take into account the period plaintiff taught prior to her taking a maternity leave in their determination as to whether she has attained tenure serve as a present violation of Title VII? I feel I must answer this question in the negative. As unfair as it may seem, under the rationale of *Evans,* this Court may not consider the reason for which plaintiff took her maternity leave. It may only consider the fact that she took such an extended leave for the entire 1973–74 school year. Thus, under *Evans,* that leave is the equivalent of one taken voluntarily. I believe the question then becomes whether plaintiff can prevail in a sex based discrimination claim under Title VII on the theory that her "voluntary" maternity leave of absence for a full year is being unreasonably treated differently than other types of leaves for the same duration that she or another teacher might take. Following the rationale in *Evans,* she can not. A review of the controlling collective bargaining agreement reveals that, besides maternity leave, there are a number of other types of extended leaves of absence that apparently may be taken by non-tenured teachers: up to one year for the purpose of engaging in full-time work with the Massachusetts Teachers Association and/or the National Education Association; military leave to any teacher who is inducted or enlists in the armed forces; up to one year for the purpose of caring for a sick member of one's immediate family; and up to one year to campaign for public office. In addition, each teacher may accumulate up to fifteen sick days per year. Those sick leave days may be accumulated from year to year with no maximum.

From what is presented in the record, there is nothing to indicate that defendants' treatment of various extended leaves of absence, whether for maternity reasons or for one of the reasons listed above, when determining tenure is anything but neutral in nature. For that reason, the Court concludes that there is nothing in defendants' refusal to apply toward tenure plaintiff's time served as a teacher before her mater-

nity leave that presents a violation of Title VII.[3] Plaintiff's Title VII claim, as it relates to the alleged discriminatory act that took place in 1973, is time-barred. Defendants' 12(b)(1) motion is therefore granted as to that portion. As to the remaining aspect of that claim, which goes to the present refusal of defendants to grant plaintiff tenure, defendants' motions under Rules 12(b)(1) and 12(b)(6) are denied. The Court reaches the conclusion, however, that it must rule in favor of defendants regarding that aspect of plaintiff's complaint.

It is with the portion of her complaint dealing with section 1983 that I feel plaintiff ultimately prevails. Before reaching the merits of that claim, however, it is necessary to deal once more with defendants' motions. Their Rule 12(b)(6) motion is denied as to plaintiff's allegations brought under section 1983. It cannot be said "that the plaintiff can prove no set of facts in support of [her] claim which would not entitle [her] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted).

Turning to defendants' 12(b)(1) motion and the question of whether plaintiff is required to exhaust her contractual administrative remedies before being allowed to request relief in this Court under section 1983, it is evident that many, if not a majority, of the circuits have determined that that requirement is irrelevant to such suits.[4] This has apparently come from their conclusion that the Supreme Court cases dealing with the issue, and more specifically *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and *McNeese v. Board of Education*, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), allow federal courts to entertain section 1983 actions even though judicial or administrative remedies have not

been exhausted. While *Monroe* dealt with the issue of exhaustion of state judicial remedies, *McNeese* was concerned with exhaustion of administrative remedies provided by state law.

Not all of the circuits, however, agree that a litigant is free to file an action based on section 1983 without making at least an initial attempt to seek an administrative determination. One such circuit which takes this minority approach is our own. The case of *Raper v. Lucey*, 488 F.2d 748 (1st Cir. 1973), an action brought under 42 U.S.C. § 1983, dealt with an allegation that deficiencies in the Commonwealth's administrative procedures governing motor vehicle license applications violated procedural due process. The Court was apparently not persuaded by defendant's argument that the case should have been dismissed for plaintiff's failure to exhaust available state administrative remedies. It reasoned that, "[i]n the first place, we think the available administrative procedures would not have responded to plaintiff's demand for procedural due process." 488 F.2d 751, n. 3. The Court added: "Moreover, a series of recent Supreme Court decisions . . . have led many lower federal courts to conclude that such a requirement is no longer necessary in § 1983 cases." *Id.* (citations omitted). After citing examples of that approach from a number of other circuits, the Court clarified its own position as to the exhaustion issue. The language is pertinent to the instant case:

> We concede that several of our own recent opinions in the area of school administration, read broadly, would seem out of step with these authorities. *Beattie v. Roberts*, 436 F.2d 747, 748–749 (1st Cir. 1971); *Drown v. Portsmouth School Dist.*, 435 F.2d 1182, 1186 n. 10 (1st Cir.

3. The Court wishes to make it clear that it is the lengthy nature of plaintiff's maternity leave and the Court's inability to consider the reason for it being taken that lead the Court to reach such a conclusion under Title VII. A voluntary maternity leave lasting no longer than the amount of sick leave days a non-tenured teacher had accumulated might result in a different determination. That would present an issue

not before this Court, that is, whether under Title VII, a maternity leave may be treated differently than a "sick" leave of the same duration.

4. For a discussion of section 1983 and the development of the no-exhaustion approach see Comment, 7 Seton Hall L.Rev. 366, 371–81 (1976).

1970), cert. denied, 402 U.S. 972, 91 S.Ct. 1659, 29 L.Ed.2d 137 (1971); *Dunham v. Crosby*, 435 F.2d 1177, 1180 n. 2 (1st Cir. 1970). To the extent that they indicate a general or automatic requirement of administrative exhaustion in § 1983 cases, we note our disapproval and signal our acceptance of the earlier cited line of cases. But we adhere to our view of the necessity for ripeness to the extent that there must be at least some definitive administrative or institutional determination before a § 1983 action may arise. We subscribe to the view expressed in *Stevenson v. Board of Education*, 426 F.2d 1154, 1157 (5th Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970), that we should not "intervene in school personnel and management problems without requiring such prior reference to local institutional authority as may be necessary to assure that the action complained of is final within the institution in the sense that it is ripe for adjudication."

*Id.*

■ The wording of the above passage is clear and can easily be taken as support for the position that in the instant case plaintiff should have pursued her contractual administrative remedies before filing a section 1983 action in this Court. However, I believe that the issues presented here are of a nature that allows this Court to retain jurisdiction of the case, yet not be in conflict with the approach set forth in *Raper*. The essence of plaintiff's case is not a challenge to the interpretation given to a provision or provisions of the collective bargaining agreement between the Chicopee Teachers Association and the School Committee. Rather, plaintiff's claim is that the mandatory leave provision of the collective bargaining agreement is in itself discriminatory and that, coupled with defendants' subsequent refusal to grant her tenure, it has deprived her of rights guaranteed her under the Fourteenth Amendment. Because plaintiff's case is of such a nature, I do not believe that the available administrative remedies would have been able to properly respond to her demands. Actually,

by the fact that plaintiff had been denied tenure by the Chicopee School Committee, it is evident that her resort to the grievance procedure set forth in the collective bargaining agreement, already discussed, would have been futile through level three (which is that of filing a grievance with that very Committee). All that would have remained for plaintiff to do would be to take her grievance to the American Arbitration Association. That organization, beneficial as it is in many situations involving disputes, is not in my mind the appropriate body to deal with plaintiff's claim. I therefore do not feel that, in this situation, plaintiff was required to exhaust her administrative remedies before filing suit in federal court. Defendants' motion to dismiss under Rule 12(b)(1) is therefore denied.

■ There seems to be no question that a mandatory maternity leave provision or rule compelling a teacher to quit her job without pay several months before the expected birth of her child and not allowing that teacher to return to work until some set time after the birth is violative of the Due Process Clause of the Fourteenth Amendment. *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). The significance of *LaFleur* in relation to the instant case goes much deeper than that general ruling, however. In that case, two pregnant school teachers challenged the constitutionality of mandatory maternity leave rules of the Cleveland, Ohio and Chesterfield County, Virginia, School Boards. The former required such a teacher to take an unpaid maternity leave five months prior to the expected birth of her baby, with application being made at least two weeks before departing. She was then ineligible to return until the next regular semester after her child was three months old. The latter required the teacher to leave her job at least four months, and to give notice at least six months, before the expected birth. No time limitation was set regarding the teacher's return to work, although verification of her fitness was required from a physician.

Turning to the analysis of the case at hand, the Supreme Court stated that it has long recognized that freedom of personal choice in matters of family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment. . . . [T]here is a right "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."

414 U.S. at 639–40, 94 S.Ct. at 796 (citations omitted). Having thus made clear its feeling that the freedom described above is to be guarded carefully, the Court turned to the specific matter presented by respondents.

> By acting to penalize the pregnant teacher for deciding to bear a child, overly restrictive maternity leave regulations can constitute a heavy burden on the exercise of these protected freedoms.

*Id.* at 640, 94 S.Ct. at 796. The Court then stated that the issue to be determined was "whether the interests advanced in support of the rules . . . can justify the particular procedures" adopted by the School Boards. *Id.* The School Boards argued that cutoff dates "were necessary to maintain continuity of classroom instruction" and "protect[ed] the health of the teacher and her unborn child, while at the same time assure[d] that students have a physically capable instructor in the classroom at all times." *Id.* at 640–41, 94 S.Ct. at 797.

The Court was unpersuaded by the School Boards' arguments. It recognized that continuity of instruction was "a significant and legitimate educational goal." Nevertheless, although it felt that advance-notice provisions in the rules were rational and were possibly necessary to serve the objective of continuity of instruction, absolute requirements of termination months in advance of birth were not. Commenting that "continuity would seem just as well attained if the teacher herself were allowed to choose the date upon which to commence her leave," the Court concluded:

> [T]he arbitrary cutoff dates embodied in the mandatory leave rules before us have no rational relationship to the valid state interest of preserving continuity of instruction. As long as the teachers are required to give substantial advance notice of their condition, the choice of firm dates later in pregnancy would serve the boards' objectives just as well, while imposing a far lesser burden on the women's exercise of constitutionally protected freedom.

*Id.* at 643, 94 S.Ct. at 798.

The Court was equally unpersuaded by the assertion that cutoff dates were justified by the necessity of keeping physically unfit teachers out of the classroom. It recognized that such an objective was legitimate. However, it felt the rules were overly broad:

> The provisions amount to a conclusive presumption that every pregnant teacher who reaches the fifth or sixth month of pregnancy is physically incapable of continuing. There is no individualized determination by the teacher's doctor—or the school board's—as to any particular teacher's ability to continue at her job. The rules contain an irrebuttable presumption of physical incompetency, and that presumption applies even when the medical evidence as to an individual woman's physical status might be wholly to the contrary.

*Id.* at 644, 94 S.Ct. at 798. Reviewing its decisions in *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), and *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court reiterated its disfavor under the Due Process Clauses of the Fifth and Fourteenth Amendments for irrebuttable presumptions and determined that the principles found in those and other cases dealing with that issue controlled its decision in *LaFleur.* It went on to state that

> the ability of any particular pregnant woman to continue at work past any fixed time in her pregnancy is very much an individual matter. Even assuming, *arguendo,* that there are some women who would be physically unable to work past the particular cutoff dates embodied

in the challenged rules, it is evident that there are large numbers of teachers who are fully capable of continuing work for longer than the Cleveland and Chesterfield County regulations will allow. Thus, the conclusive presumption embodied in these rules, like that in *Vlandis,* is neither "necessarily [nor] universally true," and is violative of the Due Process Clause.

*Id.* at 645–46, 94 S.Ct. at 799 (footnote omitted). The Supreme Court concluded that

neither the necessity for continuity of instruction nor the state interest in keeping physically unfit teachers out of the classroom can justify the sweeping mandatory leave regulations that the Cleveland and Chesterfield County School Boards have adopted. While the regulations no doubt represent a good-faith attempt to achieve a laudable goal, they cannot pass muster under the Due Process Clause of the Fourteenth Amendment, because they employ irrebuttable presumptions that unduly penalize a female teacher for deciding to bear a child.

*Id.* at 647–48, 94 S.Ct. at 800.

As to a time limitation that one of the rules placed upon a teacher's eligibility to return to work after giving birth, the Court stated:

To the extent that the three-month provision reflects the school board's thinking that no mother is fit to return until that point in time, it suffers from the same constitutional deficiencies that plague the irrebuttable presumption in the termination rules. The presumption, moreover, is patently unnecessary, since the requirement of a physician's certificate or a medical examination fully protects the school's interests in this regard. And finally, the three-month provision simply has nothing to do with continuity of instruction, since the precise point at which the child will reach the relevant age will obviously occur at a different point throughout the school year for each teacher.

Thus, we conclude that the Cleveland return rule, insofar as it embodies the three-month age provision, is wholly arbitrary and irrational, and hence violates the Due Process Clause of the Fourteenth Amendment. The age limitation serves no legitimate state interest, and unnecessarily penalizes the female teacher for asserting her right to bear children.

*Id.* at 649–50, 94 S.Ct. at 800–801 (footnote omitted).

An initial reading of *LaFleur* would lead one to conclude that, while the Supreme Court finds mandatory maternity leaves with arbitrary termination and return dates repugnant to the Constitution, it would not find more carefully defined mandatory leaves for purposes of maternity unreasonable. However, it would seem that such an interpretation of *LaFleur* would be in direct conflict with the Court's attitude toward irrebuttable presumptions, expressed not only in that case but also in a number of prior decisions. If *LaFleur* is to be read to approve of mandatory maternity leave, what form could such a leave take without irrebuttably presuming the physical incompetency of a female teacher? As the Supreme Court recognizes in *LaFleur,* "the ability of any particular pregnant woman to continue at work past any fixed time in her pregnancy is very much an individual matter." *Id.* at 645, 94 S.Ct. at 799. The same is certainly also true of the time a woman needs before being physically able to return to her teaching position. Thus, while it might be unusual, a teacher might physically require no more than several weeks to bear a child and recuperate, a time span no longer than a winter or spring vacation in many school systems. To carry this idea to the extreme, can it be irrebuttably presumed that a teacher would not be able to bear a child and recuperate in a matter of days, thereby missing very few teaching days, or none if the child was born on a weekend? Although the natural reaction of many might be to strongly disapprove of a mother who returned to work so quickly after bearing a child, that is something which a court can not take into account and at the same time rule objectively on the

legal issues presented in the instant case. In reality, such an occurrence is most unlikely and is only raised here to clarify the Court's position that mandatory cutoff dates, however brief they make a mandatory maternity leave, create irrebuttable presumptions as to the physical competency of a teacher experiencing pregnancy and the recuperation after childbirth.

 It is for the above reasoning that this Court concludes that the reasoning in *LaFleur* is not meant to approve of mandatory maternity leaves, whatever their duration. Rather, the statement in *LaFleur* that "[a]s long as the teachers are required to give substantial advance notice of their condition, the choice of firm dates later in pregnancy would serve the boards' objectives just as well," should be interpreted as meaning that maternity leaves are not necessarily required, and that the ultimate determination as to whether time off for maternity reasons is necessary at all during the school year must be reached by the woman and her physician in cooperation with the School Board.

Turning to the situation presented in the case now before the Court, it is clear that under *LaFleur* the maternity leave that plaintiff was forced to take violated the Due Process Clause of the Fourteenth Amendment in that it established arbitrary points in time when she was required to leave her position and when she would be eligible to return. In addition, for the reasons already discussed, I feel that *LaFleur* should also be taken to mean that defendants should not have required plaintiff to take any maternity leave, and that the choice of whether or not to do so should have been left to plaintiff and her physician.

 Defendants argue that, regardless of whether or not plaintiff would have been required to take maternity leave, the amount of days she would have been physically able to teach during the 1973–74 school year would have been too few to constitute a year of service under Mass.Gen. Laws c. 71, § 41 for the purposes of establishing tenure. Defendants add:

> Since the Defendant's maternity leave policy did not *cause* the Plaintiff to lose tenure status and since a break in service caused by pregnancy cannot be given favored treatment over other breaks in service of like time period for tenure purposes, the Defendant was not required to elect the Plaintiff to tenure status.

(Emphasis in original.)

Although plaintiff did not teach at all during the 1973–74 school year, she was apparently capable of doing so, for at least part of it, as evidenced by her testimony at the June 23, 1977 hearing, when she stated that from August, 1973, until Thanksgiving of that year she took other jobs under a manpower program. It was her decision to stop working at that time. Her son was born on January 5, 1974. Plaintiff testified that she was unable to work for eight weeks after the date of birth.

By way of some rather questionable logic, defendants assert that even if plaintiff had not been required to take her leave of absence,

> she would have broken her consecutive years of service during the period from Thanksgiving Day, 1973, through the end of April, 1974. The Plaintiff was physically unable to work during that period of time. The public schools were in session in 76 days during that period.

Defendants continue that

> the Plaintiff chose not to work between April 1974 and the end of June 1974, during which period the public schools were in session 50 days. The Plaintiff wrote to the School Committee in the Spring of 1974 and asked for permission to return to service prior to the normal expiration of her maternity leave in January 1975. However, she asked that her service commence no sooner than September 1974. Thus, without regard to the Defendant's maternity leave policy, the Plaintiff would have missed at least 76, and probably as many as 126 days of school out of a total of 180 days for the 1973–1974 school year.

I cannot agree with the above reasoning. Although plaintiff did decide not to work at some alternate form of employment beyond Thanksgiving, 1973, that cannot be taken by this Court to mean she was unable to work past that date. There is nothing in the record to indicate how near to the birth of her child plaintiff would have worked had she been able to maintain her teaching position in the fall and winter of the 1973–74 school year. Indeed, it is pure conjecture to estimate how long plaintiff, by every indication a competent and enthusiastic teacher, would have taught before the birth of her baby had she been afforded the opportunity. It is not unlikely that she would have remained working for a longer period, had there been the incentive of knowing that she could continue doing the job for which she was trained, rather than taking on a temporary and possibly less stimulating position. It is even possible that plaintiff, knowing she could return to her classroom as soon after the birth of her son as she had desired, would have resumed teaching sooner than eight weeks thereafter.

Assuming, *arguendo,* that in line with the above reasoning, plaintiff was physically competent to teach until just prior to the day she gave birth to her son on January 5, and could have returned to her job in eight weeks or less, it then becomes possible to state that, had she not been forced to take a longer maternity leave, plaintiff might have found it necessary to be absent from her teaching position for a much shorter period, conceivably a term even shorter than the total amount of sick leave days that she could have accumulated in her service from September, 1971, through January, 1974. The question that then presents itself is whether the Chicopee School Committee can properly distinguish between a maternity leave and a sick leave of the same duration. What the Court is ultimately faced with, therefore, is whether such a differentiation between these two forms of leave creates a gender based classification that is violative of the Equal Protection Clause.

A reading of the recent gender based cases issued by the Supreme Court seems to indicate the emergence of a new standard which should control the determination of such cases. The District Court of New Hampshire has within the past few months discussed this new test, and characterizes it as "standing somewhere between strict scrutiny and rational basis." *Meloon v. Helgemore,* 21 Crim.L.Rep. 2171 (April 21, 1977). Although it appears as if the Supreme Court "has had difficulty in agreement upon a standard of equal protection analysis that can be applied consistently to the wide variety of legislative classifications," *Craig v. Boren,* 429 U.S. 190, 210, 97 S.Ct. 451, 464, 50 L.Ed.2d 397 (1976) (Powell, J., concurring), the language found in *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), seems to express the standard that would be most readily accepted in a case of this nature. *Reed* states:

> A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."

*Id.* at 76, 92 S.Ct. at 254.

I can conceive of no constitutionally valid reasons for defendants treating a maternity leave of short duration differently than any other leave of a similar period in its determination of whether a teacher is to be given tenure. I recognize that there may be situations where classifications could be created separating persons on the basis of pregnancy and non-pregnancy related matters and still be properly related to the object of some legislation, rule, or plan. *See, e.g., Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), in which the Supreme Court stated that California's decision not to insure under its disability insurance program the risk of disability resulting from normal pregnancy did not constitute invidious discrimination violative of the Equal Protection Clause. Nevertheless, the classification established by defendants herein bears no fair

and substantial relation to the object of the School Committee's rule. In addition, the damage that results from the classification, plaintiff's ineligibility to attain tenure status, is a most severe penalty. That status, possibly unique to the teaching profession, creates a level of job security found in few other employment situations. To rule that the differentiation established by defendants is valid places plaintiff in an extremely unreasonable position: She must decide whether to sacrifice any service she has accumulated toward receiving tenure by taking maternity leave or to forego childbirth until she has attained that status. To be forced to make such a choice places a heavy burden on a teacher's personal choice in matters of family life.

I rule that the provision in the collective bargaining agreement between the Chicopee Teachers Association and the Chicopee School Committee, requiring plaintiff to take a mandatory maternity leave, violates rights guaranteed plaintiff under the Due Process Clause of the Fourteenth Amendment. I further rule that defendants' act, treating plaintiff's leave of absence for maternity as a break in service for tenure, is in violation of the Fourteenth Amendment because it singles out plaintiff for separate treatment and does not meet the Constitutional test required of a sex-based rule since it has no "fair and substantial relation" to the object of such a rule.

Accordingly, defendants are hereby permanently enjoined from giving force and effect to the termination of plaintiff's employment without complying with the procedures set forth in Mass.Gen.Laws c. 71, § 42. Defendants are ordered to reinstate plaintiff to a full-time teaching position, effective September, 1977, and to acknowledge her tenure status and afford her all the rights and privileges that are associated with a teacher serving at discretion under Mass.Gen.Laws c. 71, § 41. Defendants are hereby further ordered to reimburse plaintiff for reasonable and necessary attorney's fees incurred in bringing this action.