# IN THE SUPREME COURT OF IOWA

No. 14–0413

Filed December 24, 2015

**KAREN McQUISTION,**

Appellant,

vs.

**CITY OF CLINTON, IOWA; MARK REGENWETHER; JEFFREY FARWELL;** and **JEFFREY HORNE,**

Appellees.

---

Appeal from the Iowa District Court for Clinton County, Henry W. Latham II, Judge.

Claimant appeals from summary judgment dismissing claims of pregnancy discrimination under the Iowa Civil Rights Act and equal protection and due process violations under the Iowa Constitution. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Roxanne Barton Conlin of Roxanne Conlin & Associates, P.C., Des Moines, for appellant.

Cynthia Sueppel of Scheldrup Blades Schrock Smith P.C., Cedar Rapids, for appellees.

Thomas J. Duff of Duff Law Firm, P.L.C., Des Moines, Kodi A. Brotherson of Becker & Brotherson Law Firm, Sac City, Katie A. Ervin Carlson of Babich Goldman P.C., Des Moines, and Emily E. McCarty of Fiedler & Timmer, P.L.L.C., Urbandale, for amicus curiae Iowa Association for Justice.

**CADY, Chief Justice.**

In this case, we are presented with the question whether a city discriminates under the Iowa Civil Rights Act and the Iowa Constitution by refusing to accommodate a pregnant employee with light duties when requested due to her pregnancy. The district court granted summary judgment to the defendants, City of Clinton and three of its employees, finding as a matter of law no discrimination had occurred. On our review, we adapt our test for the evaluation of pregnancy discrimination claims and remand the case to the district court to consider the statutory civil rights claim under this new standard. We conclude the undisputed material facts of this case do not support equal protection and due process claims under the Iowa Constitution. Accordingly, we affirm the district court in part, reverse in part, and remand for further proceedings.

## I. Background Facts and Proceedings.

Karen McQuistion is employed as an engineer and paramedic for the City of Clinton fire department. She was a ten-year veteran of the department during the events in question. She began as a firefighter in 2001 and was promoted to her current position in 2008.

In May 2011, McQuistion informed Fire Chief Mark Regenwether she was pregnant. McQuistion was in the early stages of pregnancy at the time. She requested light-duty assignments for the duration of her pregnancy. The requested accommodation was based solely on her pregnancy and the nature of her job and not on any underlying pregnancy-related medical condition amounting to disability.

The City of Clinton maintained an administrative policy governing light-duty assignments. The policy described the circumstances when light duty was available to employees, generally authorizing light duty for

employees who had been injured on the job and were eligible for workers' compensation benefits. This policy controlled light-duty assignments unless it conflicted with the terms of a collective bargaining agreement. Under a collective bargaining agreement between police officers and the City, a police officer who becomes pregnant is entitled to light-duty assignments. The fire department's collective bargaining agreement did not contain a clause expanding light-duty assignments beyond the policy either to pregnant employees or any other employees suffering temporary disabilities resulting from off-the-job events.

The light-duty policy of the City defined light duty as "modified work for employees injured on the job unable to temporarily return to their regular classification." It is work for an employee "who can return to work but is not yet physically capable of fulfilling the work normally assigned."[1] The policy articulates four benefits of light duty:

a. Getting an employee back to the workplace as soon as possible after an on-the-job injury when there is not a risk to him/her and others;

b. Minimizing financial hardship and emotional stress to an employee injured on the job;

c. Retaining qualified and experienced workers;

d. Minimizing cost of workers' compensation and other related programs.

Light duty generally involves the modification of the worker's normal job duties. For a firefighter, this means conducting inspections, fire prevention duties, training assignments, and other duties that do not include the emergency response requirements of the job. These duties can be performed independent of the normal physical requirements for

---

[1]The policy provides that any employee refusing a light-duty assignment consistent with their medical restrictions may lose eligibility for workers' compensation benefits during the time of refusal.

fire department employees. The normal job duties for an engineer and paramedic in the fire department include:

1. Responding to emergency fire incidents.
2. Responding to emergency rescue incidents.
3. Responding to hazardous materials incidents.
4. Responding to emergency medical incidents.
5. Responding to emergency airport incidents.
6. Performing required training tasks.
7. Performing required maintenance tasks.
8. Performing Fire Prevention and Public Education Assignments.

Fire Chief Regenwether denied McQuistion's request for a light-duty assignment. He determined she was not entitled to light duty under the city administrative policy because she did not have a disabling injury that occurred on the job.

McQuistion continued to perform her regular job duties as an engineer and paramedic for the fire department after her request for light duty was denied. In June, Fire Chief Regenwether met with city officials in an effort to provide an accommodation for McQuistion, without success. The city officials who participated in this meeting and the decision to deny the request included Jeffrey Farwell, the city attorney, and Jeffrey Horne, the city administrator.

By the end of September, McQuistion's pregnancy had advanced to the point that she was no longer able to perform her required emergency-response duties safely and her protective uniform no longer fit her. Her doctor recommended she stop performing her regular duties. As a result, McQuistion took a leave of absence from work by using accrued vacation and sick leave time. She was paid during this time period. Once she exhausted the vacation and sick leave, however, her leave of absence was

unpaid. McQuistion gave birth in January 2012. She returned to her job as an engineer and paramedic for the fire department in March.

McQuistion brought a lawsuit against the City of Clinton and the individuals who participated in the decision to deny her light duty (collectively referred to as the City). She alleged pregnancy discrimination under Iowa Code section 216.6(2), a violation of her equal protection rights under article I, section 6 of the Iowa Constitution, and a violation of her due process rights under article I, section 9 of the Iowa Constitution. The City moved for summary judgment. It asserted McQuistion was not entitled to an accommodation as a matter of law. It claimed the action of the City in denying light-work accommodations was not discriminatory under the Iowa Civil Rights Act and the Iowa Constitution because all fire department employees with nonwork-related disabilities were denied light-duty work. It also claimed the actions of the City did not violate the due process clause of the Iowa Constitution.

The district court found McQuistion was unable to show an inference of discrimination under the Iowa Civil Rights Act because the City policy denies light work to both pregnant employees and nonpregnant disabled employees who are not injured on the job. It found the undisputed facts of the case failed to establish pregnancy discrimination under the Iowa Civil Rights Act or the Iowa Constitution. It found the policy of the City treated all employees who were not granted separate rights under a collective bargaining agreement the same. It also found the policy did not impinge upon McQuistion's fundamental right to procreate. McQuistion appealed.

## II. Standard of Review.

We review district court summary judgment rulings for corrections of errors at law. *Goodpaster v. Schwan's Home Serv., Inc.,* 849 N.W.2d 1,

6 (Iowa 2014). Summary judgment is properly granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* We construe the record in the light most favorable to the nonmoving party. *Id.* However, to survive a motion for summary judgment, sufficient facts must be in the record to support the claim that a reasonable fact finder could find in the nonmoving party's favor. *See Smidt v. Porter*, 695 N.W.2d 9, 15 (Iowa 2005).

Statutory interpretation is reviewed for errors at law. *State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013). "If the statute is capable of being construed in more than one way, one of which is constitutional, we must adopt the constitutional construction." *Hensler v. City of Davenport*, 790 N.W.2d 569, 578 (Iowa 2010). Our review of constitutional claims is de novo. *State v. Groves*, 742 N.W.2d 90, 92 (Iowa 2007).

### III. Statutory Analysis.

The Iowa Civil Rights Act of 1965 makes it an unfair or discriminatory practice for any person to discriminate in employment against an employee based on various classifications, including the "sex . . . or disability of such . . . employee." Iowa Code § 216.6(1)(*a*) (2011).[2] In the early years following the enactment, claims involving discrimination based on pregnancy emerged in several cases, even though pregnancy was not specifically mentioned in the Act as a protected classification. In 1975, we held that pregnancy constituted a

---

[2]The Iowa Civil Rights Act of 1965 did not originally prohibit discrimination on the basis of sex or disability. *See* Iowa Code § 105A.7 (1966). The Act was amended in 1970 to add discrimination on the basis of sex to the statute's list of prohibited discrimination. 1970 Iowa Acts ch. 1058 (codified at Iowa Code ch. 105A (1971)). Disability discrimination was added to the list in 1972. 1972 Iowa Acts ch. 1031 (codified at Iowa Code ch. 601A (1973)).

temporary disability and concluded an employment policy that failed to treat pregnant employees in the same manner as disabled employees regarding the imposition and use of leave constituted sex discrimination under the Act. *Cedar Rapids Cmty. Sch. Dist. v. Parr*, 227 N.W.2d 486, 493, 495–96 (Iowa 1975) (finding the employment policy discriminated under the Act because it imposed special restrictions on pregnant employees that did not apply to employees with other conditions). We subsequently reiterated this position on two occasions in 1978, rejecting as discriminatory in both cases employment policies that excluded pregnancy from benefits provided for employees disabled from nonwork injuries. *See Franklin Mfg. Co. v. Iowa Civil Rights Comm'n*, 270 N.W.2d 829, 834 (Iowa 1978) (rejecting a group insurance plan that did not cover pregnancy because it was not an illness or injury); *Quaker Oats Co. v. Cedar Rapids Human Rights Comm'n*, 268 N.W.2d 862, 864, 867 (Iowa 1978) (rejecting a plan that specifically excluded pregnancy from coverage), *superseded on other grounds by statute*, 1978 Iowa Acts ch. 1179, § 21 (codified at Iowa Code § 601A.19 (1979)). These two decisions rejected the reasoning of the United States Supreme Court decision in *General Electric Co. v. Gilbert*, which held that a company plan that excluded pregnancy from "nonoccupational sickness and accident benefits to all employees" did not constitute sex discrimination under Title VII of the Civil Rights Act of 1964 because it did not provide benefits to one gender that did not accrue to the other, and the failure to cover pregnancy-related risks did not destroy the presumed parity of the benefits and render it discriminatory. 429 U.S. 125, 128, 138–39, 97 S. Ct. 401, 404, 409–10, 50 L. Ed. 2d 343, 349, 355–56 (1976), *superseded by statute*, Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, 92 Stat. 2076 (codified at 42 U.S.C. § 2000e(k) (2012)). The

Court took the view that the plan did not discriminate based on sex because, in the final analysis, the same protection provided for men was provided for women. *Id.* at 138–39, 97 S. Ct. at 409–10, 50 L. Ed. 2d at 355–56. Both *Franklin Manufacturing* and *Quaker Oats* made it clear that the Iowa Civil Rights Act would be construed differently than the Federal Civil Rights Act was in *Gilbert* by instead treating pregnancy discrimination as sex discrimination. *Franklin Mfg. Co.*, 270 N.W.2d at 831; *Quaker Oats Co.*, 268 N.W.2d at 866–67. Therefore, under the Iowa Civil Rights Act, terms and conditions under an employment disability policy must apply to pregnant employees the same as they apply to all other employees. *See Parr*, 227 N.W.2d at 494 (finding no viability in a differentiation between pregnancy and "other disabling conditions which qualify an employee for sick (disability) pay").

In response to *Gilbert,* Congress enacted the Pregnancy Discrimination Act of 1978 (PDA) to extend Title VII protections to pregnant women as a subset of sex discrimination. *See* Deborah L. Brake & Joanna L. Grossman, *Unprotected Sex: The Pregnancy Discrimination Act at 35,* 21 Duke J. Gender L. & Pol'y 67, 74–75 (2013). Congress rejected the approach taken in *Gilbert* and set a course more in line with the approach taken under the Iowa Civil Rights Act. Congress did this by adding new language to the definitions section of Title VII. *Id.* at 75–76; *see* 42 U.S.C. § 2000e(k). First, the amended Act declared the "ter[m] 'because of sex' . . . include[s] . . . because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Second, it added a clause providing that "women affected by pregnancy . . . shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *Id.* Thus, Congress added pregnancy to the

definition of sex discrimination and gave further structure to the process of identifying discrimination in the context of pregnancy. *See Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 285, 107 S. Ct. 683, 691, 93 L. Ed. 2d 613, 626 (1987) (indicating the second clause was intended to "illustrate how discrimination against pregnancy is to be remedied").

The Supreme Court recently discussed the scope of the rights provided to pregnant employees under the PDA in *Young v. United Parcel Service, Inc.*, 575 U.S. ___, 135 S. Ct. 1338, 191 L. Ed. 2d 279 (2015). In *Young*, the Court found the discrimination analysis under the PDA consists of two key components. First, it found the Act only requires pregnant employees to be treated the "same" as "other persons" in similarly situated jobs with a similar ability (or inability) to work. *Id.* at ___, 135 S. Ct. at 1350, 1353, 191 L. Ed. 2d at 294, 297–98; *see also id.* at ___, 135 S. Ct. at 1357–59, 191 L. Ed. 2d at 302–04 (Alito, J., concurring) (discussing how to determine a comparator group for the disparate treatment analysis). The Court observed that the clause did not broadly declare that pregnant employees needed to be treated "the 'same' as '*any* other persons.' " *Id.* at ___, 135 S. Ct. at 1350, 191 L. Ed. 2d at 294 (majority opinion). As a result, the Court rejected the notion that the PDA gave pregnant employees "an unconditional most-favored-nation status" that required employers who provided a disability accommodation to any disabled worker or a specific group of disabled workers to unconditionally provide the same accommodation to all pregnant workers with comparable limitations. *Id.* at ___, 135 S. Ct. at 1349–50, 191 L. Ed. 2d at 293–94. Importantly, the Court found nothing from the history and background of the Act to suggest Congress intended for the PDA to alter the approach of the law or to impose a "new legislative mandate" to require more favorable treatment for pregnant

employees. *Id.* at ___, 135 S. Ct. at 1350, 191 L. Ed. 2d at 294 (quoting H.R. Rep. No. 95–948, at 3–4 (1978)). Rather, the Court required each claimant make a prima facie case that they were treated differently from those similar in ability or inability to work using the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668, 677–78 (1973):

> Thus, a plaintiff alleging that the denial of an accommodation constituted disparate treatment under the Pregnancy Discrimination Act's second clause may make out a prima facie case by showing, as in *McDonnell Douglas*, that she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others "similar in their ability or inability to work."

*Young*, 575 U.S. at ___, 135 S. Ct. at 1354, 191 L. Ed. 2d at 298 (quoting 42 U.S.C. § 2000e(k)).

After establishing the criteria for a claimant to show a prima facie case, the *Young* Court turned to the question of what the employer was required to show. *Id.* The Court observed that the body of law built by the courts over the years governing disparate treatment claims generally permits an employer to maintain employment policies that may harm members of a protected class as long as the policies are not intended to harm the class and "the employer has a legitimate, nondiscriminatory, nonpretextual reason" for the different treatment. *Id.* at ___, 135 S. Ct. at 1350, 191 L. Ed. 2d at 294. Once the employer has proffered a legitimate, nondiscriminatory reason, the claimant has the chance to show that the reason offered is mere pretext to disguise discriminatory intent. *Id.* at ___, 135 S. Ct. at 1354, 191 L. Ed. 2d at 299. The Court placed limits on what could constitute the reason, noting it "normally cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those ('similar in

their ability or inability to work') whom the employer accommodates." *Id.* at ___, 135 S. Ct. at 1354, 191 L. Ed. 2d at 298 (quoting 42 U.S.C. § 2000e(k)). The Court further explained that a claimant could reach the jury "by providing sufficient evidence that the employer's policies impose a significant burden on pregnant workers" when the reason is "not sufficiently strong to justify the burden." *Id.* at ___, 135 S. Ct. at 1354, 191 L. Ed. 2d at 299. This was illustrated with the example that a claimant can raise a genuine issue of material fact showing a significant burden "by providing evidence that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers." *Id.*

Accordingly, the PDA does not mandate employers provide pregnant employees with benefits such as light-duty assignments, but rather requires an examination of the facts and circumstances in each individual case whether the employer was treating the pregnant employee the same as others "similar in their ability or inability to work." *See id.* at ___, 135 S. Ct. at 1353–54, 191 L. Ed. 2d at 298 (quoting 42 U.S.C. § 2000e(k)) (requiring each "plaintiff to make out a prima facie case of discrimination").

The path to legal recognition and prohibition of pregnancy discrimination in Iowa began in 1972 when the Iowa Civil Rights Commission (ICRC), established under the Iowa Civil Rights Act of 1965, promulgated a rule that classified pregnancy-related disabilities as temporary disabilities for job-related purposes. *Davenport Cmty. Sch. Dist. v. Iowa Civil Rights Comm'n*, 277 N.W.2d 907, 909 (Iowa 1979) (discussing the promulgation of administrative rule 4.10 on pregnancy discrimination in 1972). As with the approach later taken by Congress under the PDA in 1978, and following the lead of federal regulations

promulgated earlier in 1972 by the Equal Employment Opportunity Commission, the ICRC first declared, "Disabilities caused or contributed to by pregnancy . . . are, for all job-related purposes, temporary disabilities . . . ." Iowa Departmental Rule 4.10(2) (1973); *see also* 29 C.F.R. § 1604.10 (1973). Second, the ICRC declared that the "employment policies and practices involving . . . the availability of . . . benefits and privileges . . . shall be applied to disability due to pregnancy . . . on the same terms and conditions as they are applied to other temporary disabilities." Iowa Departmental Rule 4.10(2).

In 1987, our legislature amended the Iowa Civil Rights Act to add a section governing employment policies relating to pregnancy, substantively tracking with the 1980 version of the administrative rule promulgated by ICRC. *Compare* Iowa Code § 601A.6(2) (1989), *with* Iowa Admin. Code r. 240—3.10 (1980). Specifically, the first section declares that an employment policy that excludes employees from employment because of the employee's pregnancy constitutes prima facie discrimination. *See* Iowa Code § 216.6(2)(*a*) (2011); Iowa Admin. Code r. 161—8.55(1) (2011). The second provision contains two clauses. *See* Iowa Code § 216.6(2)(*b*); Iowa Admin. Code r. 161—8.55(2). It first declares that "[d]isabilities caused . . . by the employee's pregnancy . . . are, for all job-related purposes, temporary disabilities and shall be treated as such under any health or temporary disability insurance or sick leave plan available in connection with employment." Iowa Code § 216.6(2)(*b*). Second, it declares that

> employment policies and practices involving matters such as the commencement and duration of leave . . . and other benefits and privileges . . . shall be applied to a disability due to the employee's pregnancy . . . on the same terms and conditions as they are applied to other temporary disabilities.

*Id.* A 1980 amendment adding a third provision to the rule was subsequently adapted into the statute by the legislature in 1987, making a disability caused by a legal abortion a temporary disability under a health, temporary disability, or sick leave plan. *Id.* § 216.6(2)(*c*); *see* Iowa Admin. Code r. 161—8.55(3).

The statute then goes beyond the administrative rule to add two additional provisions governing employment policies relating to pregnancy. It makes it illegal for an employer to "terminate the employment of a person disabled by pregnancy because of the employee's pregnancy." Iowa Code § 216.6(2)(*d*). Finally, the statute requires employers to grant employees who are disabled by pregnancy a leave of absence for up to eight weeks if adequate leave is not otherwise available under an available health, temporary disability, or sick leave plan. *Id.* § 216.6(2)(*e*). The question for us is whether our legislature intended this statute to grant all pregnant employees greater rights than those guaranteed under the PDA.

The two clauses within section 216.6(2)(*b*) form the heart of this litigation. McQuistion contends these clauses grant broader protection for pregnant employees than available under the PDA. She specifically asserts that section 216.6(2)(*b*) expresses a legislative mandate that any employment policy maintained by an employer in Iowa that allows light duty for any disabled employees must also unconditionally apply to pregnant employees. Consequently, she claims an employer discriminates against pregnant employees by failing to include them unconditionally in a disability policy applicable to any disabled employees. McQuistion primarily uses the language of section 216.6(2)(*b*) and the timing of the enactment of the section to support her

claim. We first address the argument dealing with the timing of the enactment of section 216.6(2).

The amendment to the Iowa Civil Rights Act that added the provisions governing pregnancy as section 216.6(2) was enacted shortly after the United States Supreme Court decided *California Federal Savings & Loan Ass'n v. Guerra*, 479 U.S. 272, 107 S. Ct. 683, 93 L. Ed. 2d 613 (1987). McQuistion claims section 216.6(2) was enacted as a response to *Guerra* to implement broader protections and rights for pregnant employees in Iowa than provided under the Federal Civil Rights Act. In *Guerra*, the Court held that the PDA did not preempt state laws, but only established "a floor beneath which pregnancy disability benefits may not drop—not a ceiling above which they may not rise." 479 U.S. at 285, 107 S. Ct. at 691, 93 L. Ed. 2d at 626 (quoting *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 758 F.2d 390, 396 (9th Cir. 1985)). Thus, McQuistion argues that our legislature could have only believed the floor established by the PDA was too low and enacted its own version of a pregnancy discrimination law to raise the bar to give pregnant employees in Iowa greater protections.

The five provisions of Iowa Code section 216.6(2) enacted by our legislature did provide some greater rights to pregnant employees than declared under the PDA. *See* Iowa Code § 216.6(2). Thus, we agree with McQuistion that the timing of the 1987 enactment supports the proposition that our legislature intended to provide guidance that is more definite to Iowa employers than found under the PDA. The language used by the legislature supports this intent. For instance, section 216.6(2)(*e*) mandates employers grant up to eight weeks leave of absence for employees disabled due to pregnancy, a specific mandate benefiting pregnant employees not provided under the PDA. *Id.* It gives pregnant

employees a special status in Iowa relating to a leave of absence. Yet, the question is whether the legislature extended this special status to benefits such as light-duty assignments. Thus, we turn to consider the argument by McQuistion that the first clause of section 216.6(2)(*b*) gives pregnant employees a special status that requires a light-duty accommodation.

No provision in section 216.6(2) specifically requires employers provide all pregnant employees light-duty assignments or other accommodations. Instead, section 216.6(2)(*b*) declares, "Disabilities caused . . . by . . . pregnancy . . . are, for all job-related purposes, temporary disabilities and shall be treated as such under any health or temporary disability insurance or sick leave plan available in connection with employment." *Id.* § 216.6(2)(*b*). McQuistion claims this provision means *any* sick-leave policy provided by an employer that allows light duty for any group of disabled employees must apply to all pregnant employees. Since the City in this case did maintain a policy that permitted light-duty assignments for employees who were injured on the job and for pregnant police officers, McQuistion asserts that the statute mandates the same accommodation be available to all other pregnant employees.

The language of section 216.6(2)(*b*) does not support a broad mandate according all pregnant employees special benefits. McQuistion simply reads too much into the statutory language. The first sentence makes two declarations. First, it declares a disability caused by pregnancy or related condition to be a temporary disability. *Id.* Pregnancy alone does not trigger the protections of section 216.6(2)(*b*); the statute requires a disability that is "caused or contributed to" by the pregnancy or related condition for the protections to apply. *Id.* Second,

it declares a pregnancy-related disability must be treated as a temporary disability under an employment plan or policy governing temporary disabilities, not that an employer must treat the pregnancy-related disability as all other disabilities under the statute.[3]  *Id.*  However, the sentence does not address how the policy or plan must treat pregnant employees not experiencing pregnancy-related disabilities.  Instead, that issue was addressed by the second sentence of section 216.6(2)(*b*).  This clause provides:

> [E]mployment policies and practices involving matters such as the commencement and duration of leave . . . and other benefits and privileges . . . under any health or temporary disability insurance or sick leave plan . . . shall be applied to a disability due to . . . pregnancy . . . on the same terms and conditions as they are applied to other temporary disabilities.

*Id.*

Yet, this language does not readily answer the more difficult question at the center of this case: whether an employment plan for benefits complies with the statutory requirement to be applicable to disabilities due to pregnancy on the same terms and conditions as other temporary disabilities when a gender-neutral term or condition applicable to all disabilities under the plan excludes a class of temporary disabilities that includes disabilities caused by pregnancy.  *See id.*; *see also Young*, 575 U.S. at ___, 135 S. Ct. at 1351, 191 L. Ed. 2d at 295.  This was the same situation faced by the Court in *Young* under the

---

[3]This differs from the PDA, which requires all pregnant women "affected by pregnancy" or related conditions "be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work."  42 U.S.C. § 2000e(k).  The Iowa statute is drawn more narrowly, requiring "[d]isabilities caused or contributed to by the employee's pregnancy, miscarriage, childbirth, and recovery therefrom" and limiting the benefits to those provided for other temporary disabilities.  Iowa Code § 216.6(2)(*b*).

language of the PDA. *See Young*, 575 U.S. at \_\_\_, 135 S. Ct. at 1347–48, 191 L. Ed. 2d at 291–92. The Iowa statute only demands that a light-duty policy be applied to pregnancy-related disabilities "on the same terms and conditions" as the policy is applied to other temporary disabilities. Iowa Code § 216.6(2)(*b*). This clause does not specifically cover the situation in this case in which the terms and conditions for light duty applicable to all temporarily disabled employees result in the exclusion of all disabled employees who did not become disabled through a work-related injury, including employees disabled because of pregnancy or related conditions. Instead, it is clear our legislature intended for the question whether a particular term or condition applicable to all disabilities serves to discriminate against disabilities due to pregnancy to be decided under a different analysis.

Our legislature has impliedly indicated approval of the use of the *McDonnell Douglas* test to address employment policies that potentially discriminate against pregnant employees by mirroring language used in the analytical approach applied in that case. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824, 36 L. Ed. 2d at 677–78 (requiring a claimant establish a prima facie case of discrimination).[4]

---

[4]The *McDonnell Douglas* analysis is not the only one used in discrimination cases, but has long been used in cases in which a facially neutral policy is being challenged as pretext for discrimination. *See, e.g., Hayes v. Shelby Mem'l Hosp.*, 726 F.2d 1543, 1547–48 (11th Cir. 1984) (discussing when a pretext theory applies). We have also used a test from *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241–42, 109 S. Ct. 1775, 1786, 104 L. Ed. 2d 268, 282 (1989), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1075, when the plaintiff can "present credible evidence of conduct or statements of supervisors which may be seen as discrimination sufficient to support an inference that the discriminatory attitude was a motivating factor." *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 538–39 (Iowa 1996) (describing the *McDonnell Douglas* and *Price Waterhouse* methods of analysis in an age-discrimination case). Following that inference, the employer has a chance to prove the same decision would have been made without the discriminatory motive. *Boelman v. Manson State Bank*, 522 N.W.2d 73, 78 (Iowa 1994). A third theory of discrimination

Using this analytical framework, a claimant who seeks to show disparate treatment under an employment policy that does not facially exclude the protected group must first establish a "prima facie" case of discrimination based on employer actions that infer discrimination because of the protected characteristic. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 575–76, 98 S. Ct. 2943, 2949, 57 L. Ed. 2d 957, 966 (1978). Section 216.6(2)(*a*) provides that an "employment policy or practice which excludes from employment applicants or employees because of the employee's pregnancy is a prima facie violation of this chapter." Iowa Code § 216.6(2)(*a*). The burden-shifting analysis based on "prima facie" discrimination was entrenched in the law by the time the statute was enacted. *See Woodbury County v. Iowa Civil Rights Comm'n*, 335 N.W.2d 161, 165 (Iowa 1983) (using *McDonnell Douglas* analysis in a racial discrimination case under the Iowa Civil Rights Act); *King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601–02 (Iowa 1983) (applying *McDonnell Douglas* analysis in religious discrimination case under the Iowa Civil Rights Act); *see also State v. Boggs*, 741 N.W.2d 492, 503 (Iowa 2007) ("We . . . assume our legislature was familiar with the existing state of the law when it enacted [the statute] . . . ."). Furthermore, we have also adopted the framework when indirect evidence is used to infer discrimination and have specifically applied it to pregnancy discrimination. *See Smidt*, 695 N.W.2d at 14–15. Finally, the Supreme Court explicitly adopted the framework for pregnancy discrimination cases alleging disparate treatment under the PDA in *Young*, 575 U.S. at ___, 135 S. Ct. at 1353–54, 191 L. Ed. 2d at 298.

_____

analysis was used in *Pippen v. State*, 854 N.W.2d 1, 22–27 (Iowa 2014), in which we analyzed racial discrimination claims under the disparate impact theory.

Thus, we reject the argument by McQuistion that the legislature established as facially discriminatory any exclusion of a pregnant employee from any policy or plan that provides benefits for any other temporary disability. Instead, our legislature only established that the exclusion of pregnant employees and applicants by an employment policy or practice because of their pregnancies constituted prima facie evidence of discrimination. Iowa Code § 216.6(2)(*a*). Even under section 216.6(2)(*a*), the employer may then come forward with a legitimate, nondiscriminatory reason for the exclusion that the claimant can rebut with evidence that the proffered reasons are pretextual. *Smidt*, 695 N.W.2d at 15. Employment policies and practices that do not expressly target pregnant employees or applicants may still result in disparate treatment, and employees affected in such a way may show a prima facie case using indirect evidence under the *McDonnell Douglas* framework. *See Young*, 575 U.S. at ___, 135 S. Ct. at 1345, 191 L. Ed. 2d at 288–89.

Overall, our legislature intended to provide institutional protection by placing pregnant employees who become unable to complete their job duties due to a pregnancy-related disability on equal footing with other employees who become unable to perform their regular job duties because of any other temporarily disabling bodily condition. *See* Iowa Code § 216.6(2)(*b*). This equal footing was established by declaring any disability arising out of pregnancy and related conditions to be a temporary disability and requiring that all disability policies be applied to pregnancy-related and nonpregnancy-related disabilities "on the same terms and conditions." *Id.* Second, if this structural protection still results in the exclusion of pregnant employees from employment because of their pregnancies, our legislature declared the exclusion to be prima facie evidence of discrimination. *Id.* § 216.6(2)(*a*). By identifying a prima

facie case of discrimination in section 216.6(2)(*a*) when actions are taken "because of the employee's pregnancy," *id.*, our legislature necessarily signaled its intent for disparate treatment claims by pregnant employees to be resolved through an analytical framework that requires the employer to offer a legitimate, nondiscriminatory reason to exclude pregnant employees. Thus, we find the legislature intended that same analytical framework to apply in cases in which the evidence tending to prove discrimination based on pregnancy is indirect. The declared prima facie approach necessarily revealed an intent by the legislature to permit the employer to overcome a prima facie pregnancy discrimination claim, either established under the statute or shown through the *McDonnell Douglas* framework, based on legitimate reasons for excluding pregnant employees and to permit the employee to show the proffered reasons were pretextual. *See McDonnell Douglas*, 411 U.S. at 802–03, 93 S. Ct. at 1824, 36 L. Ed. 2d at 677–78. This approach ultimately reveals our legislature sought to balance the competing rights and interests of employers and employees at stake in light of the weight of the burden imposed on pregnant employees by exclusion from the policy and the strength of the neutral reason for the employer to justify the exclusion of pregnant employees.[5]

---

[5]Discrimination against the disabled is different from most other forms of discrimination because the disability itself can impact the ability of the person to perform the duties of the job. *Goodpaster*, 849 N.W.2d at 16–17. If a person is not qualified for the job, a prima facie case of discrimination cannot be established. *Id.* at 14. As a result, in order to eliminate discrimination against the disabled, the law generally requires an employer to provide reasonable accommodations that permit the person to perform the essential duties of the job. *Id.*; *see also* Iowa Admin. Code r. 161—8.27(6). We have not extended that requirement to temporary disability cases. *See Vincent v. Four M Paper Corp.*, 589 N.W.2d 55, 61 (Iowa 1999) (including a permanency analysis as an important factor in a disability discrimination claim under the statute). The extension of a duty to reasonably accommodate to include temporary disabilities, including pregnancy, is laden with policy considerations normally reserved

This approach is not only consistent with the language of the statute, as well as the approach we have taken to analyzing discrimination claims in this state, it is also consistent with the approach taken under federal law. *See Young*, 575 U.S. at ___, 135 S. Ct. at 1353–54, 191 L. Ed. 2d at 298–99. The language of the PDA differs from the language of section 216.6(2), but the concepts at play parallel each other and support similar outcomes.

This outcome largely disposes of the arguments by the City. The City's statutory argument tracked those made by UPS before the Supreme Court in *Young*—that the employer need not accommodate disability caused by pregnancy unless it falls within specifically defined categories singled out for accommodation. *See id.* at ___, 135 S. Ct. at 1344, 191 L. Ed. 2d at 288. The City argued McQuistion's treatment under the policy should only be compared with how the City treats those suffering from a disability arising outside of employment. The district court, without the benefit of the *Young* decision at the time, agreed the narrow classification was the proper comparison group. Yet, as with *Young*, the statutory remedy provided in section 216.6(2) would be rendered moot and defeat the purpose and intent of the legislature if we permitted such an easy way for employers to evade the antidiscrimination statute. *See id.* at ___, 135 S. Ct. at 1353, 191 L. Ed. 2d at 298–99. We therefore remand to the district court to evaluate McQuistion's claim under the standard articulated in *Young*,

---

for the legislative branch of government. Indeed, our legislature has considered precisely this issue in the past two general assemblies, with bills introduced that would amend section 216.6(2) to require employers to provide reasonable accommodations to pregnant employees. *See* S.F. 313, 86th G.A., 1st Sess. (Iowa 2015); S.F. 308, 85th G.A., 1st Sess. (Iowa 2013).

comparing her with all those temporarily disabled, not just those injured off the job.

#### IV. Equal Protection Claim.

McQuistion's first constitutional claim, intertwined with her discrimination claim, is an equal protection challenge under article I, section 6 of the Iowa Constitution.[6] "[E]qual protection demands that laws treat alike all people who are 'similarly situated with respect to the legitimate purposes of the law.'" *Varnum v. Brien*, 763 N.W.2d 862, 882 (Iowa 2009) (quoting *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 7 (Iowa 2004) [hereinafter *RACI*]). To prove an equal protection claim, the claimant must first establish disparate treatment and then the policy reasons for the classification are scrutinized. *Id.* at 879–80. Equal protection claims "require[] an allegation of disparate treatment, not merely disparate impact." *King v. State*, 818 N.W.2d 1, 24 (Iowa 2012).

The district court found that McQuistion failed to offer sufficient evidence that the City treated her less favorably than it treated other similarly situated City employees. It found the equal protection claim failed because McQuistion failed to show she suffered disparate treatment as a matter of law. In addressing this issue, we observe the City did not raise any argument that a constitutional claim was not available as a companion remedy or that the Civil Rights Act provides the exclusive remedy under state law. Instead, the City argued that McQuistion did not make a prima facie case of discrimination nor did she show the classification unrelated to the reasons behind the policy. Thus,

---

[6]We take this opportunity to note that under the Iowa Constitution, our equal protection law arises out of the confluence of article I, section 1 and article I, section 6. Article I, section 1 protects individuals' rights, while article I, section 6 prevents the government granting any citizen or class of citizens privileges or immunities not granted to all citizens on the same terms. Iowa Const. art I, §§ 1, 6.

we proceed to consider the equal protection claim in light of the arguments raised.

The equal protection analysis used by the district court failed to properly consider the critical aspect of the right to equal protection that the law itself be equal. *See Varnum*, 763 N.W.2d at 882–83. The district court essentially held McQuistion failed to show any disparate treatment because she was not similarly situated to the employees covered under the City policy. It found the primary purpose of the policy was to get employees receiving workers' compensation, who were unable to perform their normal work duties because of a work injury but capable of performing light-duty work, back to work earlier. Consequently, the district court reasoned that McQuistion was not similarly situated to those employees covered by the policy, and she failed as a matter of law to show she was subjected to any disparate treatment.

The problem with this analysis is that it excludes any examination of whether the purpose of the law is legitimate. *See id.* The district court only considered the purpose of the policy when defining the classification imposed by the policy. This approach caused the classification to be defined too narrowly and foreclosed any real analysis to determine if the purpose of the policy at least satisfied rational-basis scrutiny.

McQuistion did identify groups of temporarily disabled employees—pregnant police officers and City employees injured on the job—that were provided light-duty accommodations. She also offered evidence that she was similarly situated to those groups with respect to the purpose of the employment policy. This evidence showed she was not just similarly situated to City employees who became temporarily disabled off the job, but was similarly situated to all City workers with temporary disabilities that prevent them performing their regular duties.

In this respect, we recognize McQuistion does not need to show she was similarly situated in all respects to those injured on the job. Thus, construing the record in the light most favorable to McQuistion under the summary judgment standard, sufficient evidence of disparate treatment has been put forth to raise a question for the jury on the threshold issue, and McQuistion's claim needs to be evaluated based on the reasons for the disparate treatment.

Once disparate treatment has been proven, the claimant must show the reasons for the classification in the policy were not sufficiently important or related to the government's interest. *RACI*, 675 N.W.2d at 7. First, we note the policy's classification is based on whether the disabling condition arises out of the employment, not on the gender of the claimant—except in this as-applied challenge—making the proper level of scrutiny rational basis. This analysis involves three questions. First, the court must determine whether there was a valid, "*realistically conceivable*" reason for the classification. *Id.* (quoting *Miller v. Boone Cty. Hosp.*, 394 N.W.2d 776, 779 (Iowa 1986)). Next, the court must evaluate whether the "reason has a basis in fact." *Id.* at 7–8. Finally, it must determine if the relationship between the classification and the purpose for it "is so weak that the classification must be viewed as arbitrary." *Id.* at 8. The burden is not on the government to justify its action, but for the plaintiff to rebut a presumption of constitutionality. *King*, 818 N.W.2d at 28; *RACI*, 675 N.W.2d at 8.

The purpose, scope, and provisions of the City's light-duty policy all classify eligibility and the purpose of the policy as helping those injured on the job. Reasons why the policy exists include getting employees back to work after an on-the-job injury, minimizing financial hardship, retaining workers, minimizing workers' compensation costs,

and making the receipt of workers' compensation benefits contingent on performing those duties of their jobs consistent with medical restrictions. Limiting light duty to those harmed through a work injury and thereby minimizing workers' compensation costs is a realistically conceivable reason for the classification in the policy. As long as an employer must pay an employee under workers' compensation law, it is reasonable to require the employee to work to the extent the employee is capable of it.

Next, we consider whether the reason has a basis in fact. The City has provided examples of several other firefighters denied light duty when disabled from nonjob-related events, including cancer. The City has also provided an example of McQuistion being required to work light duty when she suffered an on-the-job injury. McQuistion has not challenged either the workers' compensation reason for the classification in the policy, nor its basis in fact, but argues the reason is not good enough to support the classification.

Therefore, we must determine if the relationship between the classification and the purpose for it is so weak as to be arbitrary. While some of the policy's articulated benefits, such as minimizing the employee's financial hardship and retaining workers, would apply to all temporarily disabled employees no matter the source of the injury, other benefits articulated like minimizing costs of worker's compensation programs and the provision changing eligibility for workers' compensation benefits upon refusal of light duty are clearly related only to workers' compensation situations. Providing benefits to those harmed during the course of their employment and minimizing extra costs associated with workers' compensation are legitimate purposes for the City. McQuistion has not demonstrated the classification of on- versus off-the-job injury or disability to be so tenuously related to its purpose as

to render the classification arbitrary. The classification of on- or off-the-job injuries is rationally related to the legitimate purpose of minimizing workers' compensation benefits. Therefore, we find the classification does not violate the equal protection clause.

### V. Substantive Due Process Claim.

We now turn to consider the second constitutional claim asserted by McQuistion. She asserts that the absence of a light-duty accommodation by the City infringes on her fundamental right to procreate in violation of the due process clause under article I, section 9 of the Iowa Constitution. It is very important to frame the claim properly because the due process clause of our constitution exists to prevent unwarranted governmental interferences with personal decisions in life. *Hensler*, 790 N.W.2d at 583 (evaluating whether the governmental interference was warranted); *see also Harris v. McRae*, 448 U.S. 297, 317–18, 100 S. Ct. 2671, 2688, 65 L. Ed. 2d 784, 805 (1980).

We have adopted a two-step analysis when presented with a substantive due process claim. The first step involves a determination of the nature of the right at stake. *State v. Seering*, 701 N.W.2d 655, 662 (Iowa 2005). The second step turns to an analysis of the appropriate level of scrutiny. *Id.* at 662–63. Under this step, if a fundamental right is involved, we apply a strict-scrutiny analysis. This analysis requires us to determine "whether the government action infringing the fundamental right is narrowly tailored to serve a compelling government interest." *Id.* at 662 (quoting *State v. Hernandez-Lopez*, 639 N.W.2d 226, 238 (Iowa 2002)). If a fundamental right is not infringed, the statute or governmental action "need only survive a rational basis analysis." *Id.* This analysis requires us to determine whether there is "a reasonable fit between the government interest and the means utilized to advance that

interest." *Id.* (quoting *Hernandez-Lopez,* 639 N.W.2d at 238). We begin with the first step of the analysis.

The claim articulated by McQuistion identifies the individual liberty alleged to be at stake as the right to procreate. McQuistion asserts that women have a fundamental right to procreate and that this right has been implicated by the absence of a light-duty accommodation by the City for those women who work at a job that would require a light-duty accommodation during pregnancy, such as firefighters. Her claim is built on the assertion that the absence of a light-duty policy interferes with the right to procreate by interfering with her ability to work.

The United States Supreme Court has held that the "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 639–40, 94 S. Ct. 791, 796, 39 L. Ed. 2d 52, 60 (1974). We, too, have recognized familial rights to be fundamental liberties under our Iowa Constitution. *In re Guardianship of Kennedy,* 845 N.W.2d 707, 714 (Iowa 2014) (finding a guardian sterilizing a ward without court involvement raises "serious due process concerns"); *Seering,* 701 N.W.2d at 663. The right to procreate is implied in the concept of ordered liberty and qualifies for due process protection as a fundamental right. *See Kennedy,* 845 N.W.2d at 714–15.

Consequently, McQuistion has asserted a substantial due process claim built on a fundamental right. Yet, she must additionally establish that the fundamental right asserted—her right to procreate—has been implicated by the particular governmental action at issue. *See Seering,* 701 N.W.2d at 663 (requiring accuracy and specificity in the claim to allow the court to proceed on appropriate grounds). Not every

government action that relates in any way to a fundamental liberty must be subjected to strict-scrutiny analysis. *See Zablocki v. Redhail*, 434 U.S. 374, 386–87, 98 S. Ct. 673, 681, 54 L. Ed. 2d 618, 631 (1978). Instead, the alleged infringement is unconstitutional only when it "has a direct and substantial impact" on the fundamental right. *Seering*, 701 N.W.2d at 663. Reasonable regulations that do not directly and substantially interfere with the right may be imposed. *See Zablocki*, 434 U.S. at 386, 98 S. Ct. at 681, 54 L. Ed. 2d at 631.

In *Seering*, we identified numerous cases in which the statute or government action at issue did substantially and directly impact the fundamental interest at stake. 701 N.W.2d at 663–64. We cited three U.S. Supreme Court cases examining familial rights as fundamental rights. In *Zablocki*, the Court found a state statute that prohibited a noncustodial parent ordered to pay child support from marrying without a court order substantially interfered with the right to marry. 434 U.S. at 388–90, 98 S. Ct. at 682–83, 54 L. Ed. 2d at 632. The Court in *Moore v. City of East Cleveland* found a city ordinance that excluded a grandchild from living in a single-family household substantially interfered with the freedom of personal choices in matters of family life. 431 U.S. 494, 499–500, 97 S. Ct. 1932, 1935–36, 52 L. Ed. 2d 531, 537–38 (1977). Finally, in *Loving v. Virginia*, the Court found a state miscegenation statute that prohibited interracial marriage substantially interfered with the freedom to marry. 388 U.S. 1, 11–12, 87 S. Ct. 1817, 1823–24, 18 L. Ed. 2d 1010, 1017–18 (1967). We also cited one of our own cases discussing the requirement of a direct and substantial impact. *Seering*, 701 N.W.2d at 664. In *Santi v. Santi*, we found a grandparent visitation statute impermissibly interfered with the fundamental liberty interest in parental caretaking. 633 N.W.2d 312, 317–18 (Iowa 2001).

The statute permitted court-ordered grandparent visitation over the objection of the parents in an intact nuclear family. Unlike statutes requiring car seats or vaccinations for children that only minimally intrude on a parent's protected caretaking interest, we found that the nature of the grandparent visitation statute was more invasive and had a substantial impact on the liberty interest at stake. *Id.* at 318.

Following *Seering*, we again confronted and applied the requirement of a substantive due process claim to consider whether the governmental action infringed on a fundamental right in *Hensler v. City of Davenport,* 790 N.W.2d 569 (Iowa 2010). There, we faced a challenge to a city ordinance that imposed a duty on parents to control their children and prevent them from committing unlawful acts. *Id.* at 575. The ordinance included graduated sanctions against parents for breaching this duty. *Id.* at 576. The first violation resulted in a warning letter. *Id.* The second violation required the parents to complete a parenting class. *Id.* The third or subsequent violation resulted in a civil penalty between $100 and $750. *Id.* We held the ordinance did not have a direct and substantial impact on the fundamental right to parent and exercise care and control over a child. *Id.* at 583. The force of the penalties under the ordinance did impact the right to parent, but not enough to violate the constitutionally protected right. *Id.*

McQuistion supports her claim that the City substantially interfered with her right by relying on the holding in *Rodgers v. Berger*, 438 F. Supp. 713 (D. Mass. 1977). In that case, the court considered the constitutionality of a mandatory pregnancy leave provision in a school collective bargaining agreement. *Id.* at 721. The provision required a pregnant teacher to be on leave for a year after the end of the pregnancy. *Id.* at 715. In finding the policy violated substantive due process, the

court relied on *LaFleur,* which found that "overly restrictive" maternity leave regulations create a heavy burden on the exercise of the right to procreate. *Id.* at 722 (quoting *LaFleur,* 414 U.S. at 640, 94 S. Ct. 796, 39 L. Ed. 2d at 60).[7]

Unlike the claim of governmental interference in each of these cases, this case does not allow us to consider the extent of the interference. Instead, it requires us to consider a more fundamental question of whether the interference alleged by McQuistion was created by government action. We have expressed doubt in the past about the viability of a substantive due process claim based on the failure of government to act. *King,* 818 N.W.2d at 31. The substantive due process protections under our constitution have traditionally been applied when government has engaged in actual conduct that interferes with a right. *Id.* Yet, we do not apply the affirmative and negative act distinction as a legal principle to deny relief when based on the failure of government to act, but recognize it as a general observation. We must, in every case, look behind the distinction to see if the government interference at issue—affirmative or negative—constitutes a direct and substantial infringement of a fundamental right.

McQuistion claims the City interfered with the exercise of her right to have children when it acted to deny her request to alter her job duties to enable her to work during her entire pregnancy. This claim identifies a governmental act, but it fails to further identify how McQuistion's inability to work throughout pregnancy interfered with the exercise of her

---

[7]As explained earlier, we decided this issue on statutory grounds under the Iowa Civil Rights Act and have not needed to find a constitutional basis to overturn the mandatory-leave provisions under the Iowa Constitution. *See Parr,* 227 N.W.2d at 496–97.

right. McQuistion answered by pointing to the financial burdens and resulting difficult decisions imposed on women and families by the loss of income associated with the inability to work throughout pregnancy. However, the City's decision to deny McQuistion's request for light duty did not change any of the viable choices available to her, and she has failed to identify any specific effect of the City's action on her decision to procreate. Thus, the financial obstacle she offered to support her claim of infringement on her right to procreate was not created by the City's decision to deny relief. McQuistion has not identified any facts to establish any other form of governmental interference and, so, has failed to frame a claim of infringement on a fundamental right.

Without the infringement of a fundamental right, we turn to our rational-basis analysis. When applying the rational-basis test to evaluate the policy under the due process clause of the Iowa Constitution, the claim fails. The rational-basis analysis under the equal protection clause would be equally applicable to the due process claim, with the same result—that the policy is not unconstitutional. *See RACI*, 675 N.W.2d at 7.

The outcome we reach in this case does not in any way overlook or minimize the existence of an obstacle in society faced by many women in the workplace in the exercise of their right to procreate. Due to the range of financial circumstances of all people, the financial burdens resulting from the inability to continue in employment during pregnancy could substantially interfere with the exercise of a fundamental right. The obstacle is pervasive and affects both women and men in the exercise of their right to have children when an inability to work throughout pregnancy because of the pregnancy adversely impacts the overall family finances.

Yet, this case reveals that our constitution only declares a certain level of protection for people and that the constitutional powers of courts are limited. One of the limitations revealed is the preliminary requirement for a due process claim that government action create the interference. Government action allows for the elective branches of government to debate and balance the competing interests and policies behind the government action and for laws and policies to be made or rejected based on that process. The arm of the court, however, only protects the constitutional floor of the rights of people and ensures government provides nothing less. It is up to the other branches of government to provide more. Over the years, the Iowa Civil Rights Commission and the Iowa General Assembly have engaged in this process. The resulting laws passed over the years have differed in some respects from the earlier regulations from the agency and reflect the changing ideas and attitudes of society toward pregnant workers. These laws and rules can continue to evolve as time continues to pass to reflect the will of the people. The role of courts in the process is limited to interpreting those laws when challenged as ambiguous and make certain those laws and other forms of government action, when challenged as unconstitutional, conform to the supreme law identified in the constitution. That is the role engaged in by the court today. It is not our role to do more.

## VI. Conclusion.

We reverse the district court decision granting the City summary judgment on the pregnancy discrimination claim. We remand to the district court for further consideration in light of our opinion today. We affirm the district court and dismiss the equal protection and due

process claims. We tax the costs of this action equally between the parties.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**