# IN THE SUPREME COURT OF IOWA

No. 23–1131

Submitted April 10, 2024—Filed May 10, 2024

**ELIZABETH ROBERTS,**

Appellant,

vs.

**ERIC ROBERTS,** as trustee of the **W. DAVID ROBERTS REVOCABLE TRUST, DAVE ROBERTS GROWTH & VENTURES, INC.,** and **ERIC ROBERTS** as personal representative of the **ESTATE OF WILLIAM DAVID ROBERTS,**

Appellees.

---

Appeal from the Iowa District Court for Shelby County, Craig M. Dreismeier, Judge.

A surviving spouse appeals a probate court order enforcing a postnuptial modification of a premarital agreement affecting the spouse's elective share. **REVERSED AND REMANDED.**

Mansfield, J., delivered the opinion of the court, in which all participating justices joined. Christensen, C.J., took no part in the consideration or decision of the case.

Jordan T. Glaser and Brody D. Swanson of Peters Law Firm, P.C., Council Bluffs, for appellant.

Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellees.

**MANSFIELD, Justice.**

### I. Introduction.

As the saying goes in many marriages, "what's mine is yours." But the same is not necessarily true for couples who decide to sign a premarital agreement before getting married. Under Iowa law, couples are permitted to make agreements before marriage that explain how their estates are to be divided in the event of death or divorce. If a couple has a properly executed premarital agreement, their desired plan for property division will normally control. But does Iowa law allow the couple to make changes to the agreement after they have been married?

In this case, a couple executed a valid premarital agreement shortly before their marriage. Under the agreement, each spouse waived their statutory elective share, but they also agreed that each would take one-third of the other's net real property interests at the time of death. Twenty-four years and many real property investments later, the parties executed a new agreement prepared by the husband's attorney in the form of a "partial revocation" of the premarital agreement. Under the partial revocation, the parties' waiver of elective share remained in effect, but the parties relinquished their one-third share in each other's real property investments at the time of death. Simultaneously, the wife received approximately $15,000 cash and $50,000 in debt repayment or forgiveness from the husband, plus a monthly living allowance for as long as the couple remained married.

Several years later, after the husband died, the wife contested the validity of this partial revocation. The district court rejected her challenge and enforced the partial revocation. The wife's case now comes to us on appeal. Based on our examination of Iowa law—specifically Iowa Code sections 596.7 and 597.2—we conclude that this kind of postmarital amendment to a premarital agreement

relating to inchoate dower interests in property is not enforceable. Therefore, we reverse the district court's judgment and remand for further proceedings.

## II. Background Facts and Proceedings.

**A. The Premarital Agreement and the Marriage.** David and Elizabeth Roberts were married on April 1, 1993, in Iowa. They had met in 1991. At the time of their marriage, David was fifty-four years old, and Elizabeth was fifty-one years old. David sold insurance, provided investment advice, and owned real estate and cattle. Elizabeth had a high school education and had done a variety of jobs, most recently as an interior designer. Both David and Elizabeth had offspring from prior marriages.

About two weeks before their marriage, at David's request, the couple executed an "antenuptial agreement," otherwise known as a "prenuptial agreement" or a "premarital agreement." No party contests the validity of this agreement.

The agreement provided in paragraphs one and two that David and Elizabeth would each retain their own premarital property, including "all interest, rents and profits which may in time accrue or result in any manner from increase in value, or be collected for the use of the same in any way."

In addition, paragraph four of the agreement provided that upon the death of either one, "the survivor shall have and make no claims of any kind against the estate of the other for any reason or by way of any right as the surviving spouse of such decedent for dower, statutory right, election, right of support, right of inheritance and homestead rights . . . except as specifically provided in paragraph 8." Paragraph eight in turn stated that the surviving spouse would be "awarded and receive the housing facility occupied by the Parties at the time of such death regardless of ownership thereof" and "one-third of ALL (net equity in) real property of the deceased." The one-third interest would "include any real

estate either party leaves to the other at death by will" but exclude any personal property. Paragraph ten added that David intended to acquire additional real estate and that Elizabeth would receive at least a ten percent share in that real estate—or more if she contributed capital toward the acquisition.

During the marriage, Elizabeth took part in the renovation and repair of the residential rental properties owned by David. She also "handled most of [the] mail and bills." Elizabeth further described herself as "the chief cook and bottle washer."

In 2002, David executed a will. The will left the entire estate to a revocable trust. At that time, there were various beneficiaries of the trust, including Elizabeth, David's son Eric, David's daughter Diana, and grandchildren of David and Elizabeth. However, in 2011, David amended the trust. The amended trust made Eric the trustee and, practically speaking, Eric became the sole beneficiary of the trust upon David's death.

**B. The Partial Revocation Agreement.** In 2016, David was making arrangements with his attorney to have a warranty deed prepared so that certain real property could be transferred from Elizabeth and himself to the revocable trust. At that time, his attorney advised him privately that Iowa law had changed such that a spouse's elective share was no longer effective against property held in a revocable trust under certain circumstances.[1] The attorney explained that in their case, though, Elizabeth would still be entitled to a one-third share of the real property in the revocable trust because of the antenuptial agreement.

About eight months later, in May 2017, Elizabeth prepared a note that stated in part,

> After much discussion, months of anxiety, and guilt trips, and desperation, I have come to the conclusion that the situation in our

---

[1]*See* 2015 Iowa Acts ch. 125, § 4 (codified at Iowa Code § 633.238 (2016)).

home is not going to improve. David's animosity toward my grandsons and other members of my family leaves me in the middle of a[n] unpleasant situation. I can honestly say he has good reason to feel as he does. However I am 76 years old and I would like to live in peace. I have several health problems . . . . I would like to enjoy the time I have left. In order to eliminate the debt I have a[c]quired and to protect David's int[e]rest, I will waive my dower rights to all properties, investments, and holdings . . . . David and I have disc[u]ssed the amount I will need to eliminate the debts. The amount is $62,500.00. If David wishes to consider this a pre-divorce agreement, I would like to have the 800 a month household allowance until we can come sign this agreement. [It is] imper[a]tive that this is taken care of quickly, as I plan to travel to Texas in June.

David provided this note to his attorney, asking, "Is this workable [and] decent for me?"

That December, David and Elizabeth executed a "Partial Revocation of Antenuptial Agreement" prepared by David's attorney. The agreement specifically revoked paragraph eight of the antenuptial agreement, explaining that it was "inconsistent with the desires of Dave and Elizabeth" and "inconsistent with their conduct as separate waivers of dower interests have been previously executed and recorded [with respect to individual properties]." The agreement also specifically revoked a portion of paragraph ten as "inconsistent with the desires of David and Elizabeth." In addition, the agreement stated that paragraph ten "has never been followed since the execution of the antenuptial agreement." The agreement added a recital to the effect that it had been prepared by David's attorney, that this attorney did not represent Elizabeth, and that Elizabeth "has had the opportunity to consult an attorney before signing this agreement."

The parties signed a second agreement at the same time as the partial revocation. The second agreement reiterated that the parties were executing "a partial revocation of their antenuptial agreement to make clear that neither party will claim a marital share interest in property of the other or claim any other interest in property owned by the other." This agreement stated that David would

pay approximately $50,000 to cover debts owed by Elizabeth or her grandchildren, would deliver a check in the amount of $14,700 to Elizabeth, and would thereafter pay Elizabeth $800 a month for household expenses while they remained married.

According to Elizabeth, David presented her with the partial revocation, and "[t]he entire interaction" with respect to the revocation took less than five minutes.

**C. Subsequent Events.** In 2019, David executed a new will. The second paragraph thereof stated, "I am specifically not making any devise or bequest to my spouse under this will." The will named Eric as executor and provided that the entire estate would go into David's revocable trust, of which Eric would be both the trustee and the sole beneficiary.

In 2020 and 2021, David conveyed certain property interests to Elizabeth worth approximately $900,000 in total. Based on what his father told him, Eric argues that these transactions were related to the partial revocation, although the partial revocation itself does not mention them.

**D. David Roberts's Death.** David passed away on April 2, 2022, at the age of eighty-three. Eric—acting as executor and trustee—filed a petition in the Shelby County District Court asking it to enter David's will to probate and to appoint him as the executor. According to the later-filed report and inventory, David's wealth at the time of death consisted primarily of real estate in Shelby, Harrison, and Pottawattamie Counties. Collectively, that real estate was worth approximately $15 million and was almost entirely held by the revocable trust.[2]

**E. Elizabeth Roberts's Action to Enforce the Premarital Agreement.** Elizabeth filed a motion and later a petition requesting enforcement of the

---

[2]Much of David's real estate had been transferred to the revocable trust before his death.

couple's premarital agreement, or if the district court found the agreement unenforceable, opting "to take the elective share and spousal allowance" of David's estate under Iowa Code section 633.236. In response, Eric raised the 2019 partial revocation agreement and asked the court to dismiss Elizabeth's petition.

Thereafter, Elizabeth filed a motion for summary judgment wherein she asserted that the antenuptial agreement was enforceable and the partial revocation was invalid. She characterized the partial revocation as a "post-nuptial agreement" that was not permitted under Iowa law. Further, she contended that even if Iowa might recognize postnuptial agreements, the partial revocation here was not a valid contract because it was not supported by consideration, was unconscionable, and violated public policy.

In resistance, Eric amended his answer and added a number of affirmative defenses. He alleged that David had acted in reliance on the partial revocation in transferring "approximately $900,000 in real property" to Elizabeth. Additionally, Eric counterclaimed that in the event the court found that the partial revocation was invalid, Elizabeth should be required to return the consideration—including the real property—provided by David in exchange for the agreement. Subsequently, Elizabeth filed a motion for summary judgment on the counterclaims, also resisted by Eric.

Following a hearing, the district court found that the partial revocation was valid and enforceable and "consistent with common law principles of contract law." It overruled and denied Elizabeth's first motion for summary judgment and ruled that her second summary judgment motion on the counterclaims was moot.

Elizabeth appealed, and we retained her appeal.

On appeal, Elizabeth raises several arguments. She contends that Iowa law does not allow partial revocations or, in effect, postmarital amendments of prenuptial agreements. She also argues that the partial revocation here was not supported by consideration. She maintains as well that the partial revocation was unconscionable and violated public policy. Lastly, she contends that Eric's counterclaims are not supported by the law or evidence.

### III. Standard of Review.

"Review of summary judgment rulings is for correction of errors at law." *Rand v. Sec. Nat'l Corp.*, 974 N.W.2d 87, 90 (Iowa 2022). "Summary judgment is properly granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *McQuistion v. City of Clinton*, 872 N.W.2d 817, 822 (Iowa 2015)). We view the evidence "in the light most favorable to the nonmoving party." *Id.*

### IV. Legal Analysis.

**A. Does Iowa Law Allow Partial Revocation of a Premarital Agreement?** Elizabeth asserts that the partial revocation is invalid because it is not permitted by Iowa law. Although David's attorney used the terminology "partial revocation" in drafting the 2017 agreement, we believe it is really an amendment. It doesn't eliminate all provisions of the 1993 antenuptial agreement but swaps out some obligations for other obligations. Essentially, Elizabeth received cash (and, according to Eric, some real property) in return for giving up her rights to one-third of David's real property on his death. The wording used by David's lawyer does not bind us. *See Hoffman v. Dobbins*, No. 24633, 2009 WL 3119635, at *2 (Ohio Ct. App. Sept. 30, 2009) (equating a "partial revocation" with an "attempted amendment" of a premarital agreement and finding it to be prohibited by Ohio law).

1. *Iowa Code § 596.7.* In 1983, the National Conference of Commissioners on Uniform State Laws propounded the Uniform Premarital Agreement Act (UPAA). *See generally* Unif. Premarital Agreement Act, 9C U.L.A. 35–58 (2001). The uniform law was published "to increase the certainty of enforceability of premarital agreements." *In re Marriage of Shanks*, 758 N.W.2d 506, 512 (Iowa 2008).

Our state adopted its own version of the UPAA—the Iowa Uniform Premarital Agreement Act (IUPAA)—in 1991.[3] 1991 Iowa Acts ch. 77 (codified at Iowa Code ch. 596 (1993)). The IUPAA applies to "any premarital agreement executed on or after" January 1, 1992. Iowa Code § 596.12 (2022). Thus, the provisions of chapter 596 govern this case.

Section 596.7 states,

> After marriage, a premarital agreement may be revoked only as follows:
>
> 1. By a written agreement signed by both spouses. The revocation is enforceable without consideration.
>
> 2. To revoke a premarital agreement without the consent of the other spouse, the person seeking revocation must prove one or more of the following:
>
> *a.* The person did not execute the agreement voluntarily.
>
> *b.* The agreement was unconscionable when it was executed.
>
> *c.* Before the execution of the agreement the person was not provided a fair and reasonable disclosure of the property or financial obligations of the other spouse; and the person did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other spouse.

---

[3]As of 2017, "just over half of the states" had adopted the UPAA. Deborah F. Buckman, Annotation, *Construction and Application of Uniform Premarital Agreement Act of 1983*, 33 A.L.R.7th Art. 2, § 2 (2017), Westlaw (database updated May 2024). "Approximately half of the states that have enacted the UPAA, adopted it without modifications while the others modified its language slightly." *Id.*

*Id.* § 596.7.

Notably, the UPAA—on which Iowa's uniform act was modeled—provides, "After marriage, a premarital agreement may be *amended or revoked* only by a written agreement signed and acknowledged by the parties." Unif. Premarital Agreement Act § 5, 9C U.L.A. 47 (emphasis added). Thus, Iowa did not adopt the portion of the uniform law relating to *amendment.* We have previously observed that "[c]omparison of the two Acts reveals important differences. In particular, we discern the IUPAA provides greater protection for vulnerable parties in some contexts than the UPAA." *In re Marriage of Erpelding,* 917 N.W.2d 235, 242 (Iowa 2018).

Elizabeth argues that the failure of section 596.7 to mention amendment means that premarital agreements cannot be amended during marriage; such agreements can only be revoked in their entirety. Eric, on the other hand, contends that nothing in the IUPAA forbids the parties from amending their premarital agreement during the course of marriage.

Elsewhere, differences between our version of a model act and the standard version have led us to conclude that our version should have a different meaning:

> We can determine legislative intent from selective enactment or divergence from uniform acts. We presume the Iowa legislature was aware of, but declined to follow, the [Uniform Probate Code]'s dower provision because it chose to shield the dower interest in all real estate from the estate's creditors.

*Freedom Fin. Bank v. Est. of Boesen,* 805 N.W.2d 802, 814 (Iowa 2011) (citing *State v. One Certain 1982 Honda Auto.,* 353 N.W.2d 90, 92 (Iowa 1984); *IPALCO Emps. Credit Union v. Culver,* 309 N.W.2d 484, 487 (Iowa 1981)). As we said in *State v. Olsen,* "Although we use a model act for guidance in interpreting our statutes which are patterned after such an act, when our legislature has varied

our statute from portions of a model act, the statute cannot be interpreted consistently with the model act in its entirety." 618 N.W.2d 346, 350 (Iowa 2000) (en banc).

2. *Other relevant authority.* Even before the enactment of the IUPAA, and continuing to the present day, Iowa has allowed parties to enter into *premarital* agreements waiving their elective share. *See Shanks*, 758 N.W.2d at 517 (finding a premarital agreement that waived the elective share not to be substantively unconscionable); *In re Est. of Spurgeon*, 572 N.W.2d 595, 596, 598 (Iowa 1998) (affirming a ruling enforcing a premarital agreement that "provided that in the event of death neither party would be entitled to a claim against the estate of the other"); *Cummings v. Wood*, 199 N.W. 369, 372 (Iowa 1924) ("Our statute reserves to the widow the absolute right to one–third of his property which cannot be taken away by her husband unless she consents thereto either by an antenuptial contract with him or in the absence thereof by her consent to such provision after his death."); *Fisher v. Koontz*, 80 N.W. 551, 553 (Iowa 1899) ("[A]s the antenuptial contract remains in force, the plaintiff is not entitled to a distributive share in the real estate in controversy."); *In re Est. of Ascherl*, 445 N.W.2d 391, 392–93 (Iowa Ct. App. 1989) (affirming a ruling that enforced a premarital agreement and prevented the wife from taking an elective share against her husband's will).

However, we have generally held that Iowa Code section 597.2—a provision that predates the IUPAA—stands in the way of *postmarital* agreements waiving the elective share. That section provides,

> When property is owned by the husband or wife, the other has no interest therein which can be the subject of contract between them, nor such interest as will make the same liable for the contracts or liabilities of the one not the owner of the property, except as provided in this chapter.

Iowa Code § 597.2.

In *In re Kennedy's Estate*, we interpreted an earlier iteration of this provision as meaning that "a contract between husband and wife, with reference to her interest in his estate, is of no validity whatever." 135 N.W. 53, 56 (Iowa 1912). As time went on, we clarified that this rule did not apply to all spousal contracts but to those dealing with inchoate elective-share interests. *See In re Est. of Wulf*, 471 N.W.2d 850, 853 (Iowa 1991) (en banc) (per curiam) (stating that we interpret this statute narrowly "not to limit all transactions between husband and wife, but to shield one spouse's dower interest from exploitation by the other"); *McMinimee v. McMinimee*, 30 N.W.2d 106, 109–10 (Iowa 1947) ("Plaintiff can avail herself of the written instrument (executed after marriage) only to prove the oral antenuptial contract. Because of section 597.2, Iowa Code, 1946, which forbids such contracts between husband and wife, the writing can have no validity *as a contract*. Its only service is to supply necessary *written* evidence of the otherwise unprovable prior oral agreement."); *Young v. Young-Wishard*, 288 N.W. 420, 423 (Iowa 1939) ("The [statute at issue] does not prohibit all transactions between husband and wife with references to their separate property, but only those that relate directly to their respective rights of dower."); *Battin v. Merchs.' State Bank of Correctionville*, 208 N.W. 343, 344 (Iowa 1926) (explaining that the statute rendered a postmarital agreement to deprive a spouse of their share in the deceased spouse's estate "void and wholly ineffectual"); *Martin v. Farmers' Loan & Tr. Co.*, 163 N.W. 361, 364 (Iowa 1917) (distinguishing an absolute division of property). "It is well settled that a spouse's right to a statutory distributive share is inchoate during the life of the other spouse and merely operates as a burden or encumbrance upon the real estate." *Wulf*, 471 N.W.2d at 852.

In *Hussemann ex rel. Ritter v. Hussemann*, we took stock of this precedent and considered whether a postmarital agreement waiving a spouse's right to an elective share would be valid under Iowa law. 847 N.W.2d 219, 221, 224 (Iowa 2014). The case presented a choice of law issue because the marriage had taken place in Florida, and the couple had executed the postmarital agreement in Florida before moving to Iowa. *Id.* at 220–21. We determined that Florida law—which allowed such agreements—applied. *Id.* at 222, 228. Thus, we did not speak conclusively about the validity of this kind of agreement under Iowa law. *See id.* at 226. But we relied on the foregoing authority in noting that "there appear[ed] to be a real difference in how the parties' postnuptial agreement waiving elective shares would be treated under Florida law and under Iowa law," and we presumed that the agreement would not be enforceable in Iowa. *Id.* at 224, 226.

3. *Deciding this case.* Putting sections 596.7 and 597.2 together, we conclude that Iowa law does not give married persons who previously entered into a premarital agreement the authority to enter into a new agreement during their marriage relating to inchoate dower interests in each other's property. The parties may revoke their antenuptial agreement as provided in section 596.7, but they may not make a new agreement.[4]

For one thing, meaning "is expressed by omission as well as by inclusion, and the express mention of one thing implies the exclusion of others not so

---

[4]In *Hendrick v. Hendrick*, the Oklahoma Court of Civil Appeals observed,

[I]t seems obvious to this Court, that an antenuptial agreement which has amended, modified or superseded postnuptially is no longer an antenuptial agreement. An "antenuptial agreement" by definition is one entered into before marriage and in contemplation of marriage. Calling the new agreement an "Amendment" to the Antenuptial Agreement does not alter its true nature. It is no longer an antenuptial agreement—but rather a postnuptial agreement.

976 P.2d 1071, 1072–73 (Okla. Civ. App. 1998) (citations omitted).

mentioned." *State v. Hall*, 969 N.W.2d 299, 309 (Iowa 2022) (quoting *Marcus v. Young*, 538 N.W.2d 285, 289 (Iowa 1995)). The legislature chose only the word "revoked" and did not include the word "amended" that appeared in the UPAA. The implication is that parties can revoke, but not amend, once they are married. Yet in 2017, these parties entered into an amendment rather than a revocation.

Furthermore, section 597.2 serves as a backstop. Historically, section 597.2 has been read as a prohibition on married parties contracting with respect to their inchoate rights—specifically, the elective share. Section 596.7 thus can be viewed as a specific exception to section 597.2, but only as regards revocation. *See State v. Laub*, 2 N.W.3d 821, 833 (Iowa 2024) ("[W]hen more than one statute bears on an issue, courts must attempt to harmonize the relevant statutes . . . ."). Additionally, the distinction between revocation and amendment is not an academic one. One risk of postmarital agreements is that the spouse with economic leverage (or some other type of leverage) may be able to take advantage of the other spouse. It is difficult to conceive of this being the case, though, where the postmarital agreement simply *revokes* the premarital agreement. In that event, the parties are being restored to the position they would otherwise have had under Iowa law but for the premarital agreement.[5]

We note also that the court of appeals—which sees many more family law cases than we do—concluded in a lengthy unpublished opinion in 2018 that "a premarital agreement executed after January 1, 1992, may not be amended after marriage, although it may be revoked, abandoned, or the rights thereunder

---

[5]The Oklahoma Court of Civil Appeals put it succinctly, "It simply does not follow, however, that because rescission of an antenuptial contract is permissible, a postnuptial agreement (whether starting anew or modifying an earlier agreement) must also be permissible." *Hendrick*, 976 P.2d at 1073.

waived." *In re Marriage of Hansen*, No. 17–0889, 2018 WL 4922992, at *5 (Iowa Ct. App. Oct. 10, 2018).[6]

Unlike a revocation, an amendment to a premarital agreement may leave a spouse with less than they bargained for before the marriage and less than Iowa law would otherwise afford. Indeed, Elizabeth contends that this is what happened here. In the premarital agreement, she exchanged her elective share for a one-third interest in David's net real estate. But following the partial revocation, Elizabeth continued to waive her elective share, while also relinquishing the one-third interest in David's real estate. In return she received a cash benefit of approximately $65,000 (mostly used to cover various debts, including debt owed by Elizabeth's grandsons to David) and a modest monthly allowance of $800 while married.[7] For all these reasons, we conclude that postmarital amendments to premarital agreements affecting elective shares are generally not enforceable.

4. *Our disagreement with the district court.* The district court entered a thorough and thoughtful ruling; yet in the end, we disagree with it. The court relied on one case—*O'Dell v. O'Dell*, 26 N.W.2d 401, 412 (Iowa 1947)—to conclude that "under the common law, parties to a premarital agreement could revoke or amend any part of their agreement so long as the parties were otherwise competent to contract." It then reasoned that "Chapter 596 has no

---

[6]All members of the court of appeals panel joined this conclusion; they disagreed only as to whether the postmarital agreements in question were void or merely unenforceable. One panel member concluded that they were void. *Hansen*, No. 17–0889, 2018 WL 4922992, at *19–20 (Mullins, J., concurring in part and dissenting in part). The majority concluded that because elective share was not at issue, the postmarital agreements were merely unenforceable. *Id.* at *5–6 (majority opinion). This meant they could be considered as a *nonbinding* factor in determining the property division to occur upon dissolution of marriage. *See id.* at *6; *see also* Iowa Code § 598.21(5)(*k*).

[7]We acknowledge, again, Eric's contention that David transferred approximately $900,000 in real property interests to Elizabeth before his death.

language that expressly negates the common law regarding premarital agreements."

We do not read *O'Dell* so broadly. In that case, the husband and the wife executed a prenuptial agreement at the time of their marriage in 1927. *Id.* at 403–04. It was the second marriage for both. *Id.* at 405. The wife gave up her elective share in the prenuptial agreement. *Id.* at 404. Three years into the marriage, the husband suffered a disabling stroke that left the wife having to take care of both the farm and her husband. *Id.* at 405. By 1940, about three years before he died, the husband "appreciated that the advantages of the marriage were largely with him and that the burdens were almost wholly upon his wife." *Id.* He arranged to have a new document prepared that restored the wife's elective share, which both of them signed. *Id.* at 406–10. Upon the husband's death, we held that the wife was entitled to her elective share: "There is no basis for reasonable doubt as to the intention of O'Dell to modify or rescind the prenuptial agreement, and to give to her the distributive share of his estate to which she was entitled by statute in the absence of said agreement." *Id.* at 409. Much of our decision focused on the evidentiary problems raised by the disappearance of the new document signed by the parties in 1940. *See id.* at 405–11.

In the course of our decision, we did say,

> Antenuptial contracts—designated in this record as prenuptial contracts—are in no way different from any other ordinary contract. They are to be considered, construed and treated as are contracts in general. Any executory contract, when the rights of others are not involved, may be rescinded altogether or modified, by the mutual consent of the parties. Either party may waive any right thereunder. Those who are qualified to make an antenuptial or other contract are likewise qualified, by mutual consent to eliminate or modify any part thereof, or to unmake the contract altogether, or to substitute a new contract.

*Id.* at 412 (citations omitted). But we think it overreads *O'Dell* to say it holds that *any* premarital agreement may be modified during the marriage in *any* respect. Other decisions of our court, as noted above, hold that postmarital agreements affecting elective shares are not permitted. *O'Dell* should properly be viewed as a case driven by its special facts: one spouse—in gratitude for the other spouse's sacrifices—agreed to restore the other spouse's elective share rights that had been taken away by their premarital agreement. Indeed, in a later case that did not involve a premarital agreement, we criticized *O'Dell* for its lack of precision concerning contract law when it conflated rescission and modification. *See Recker v. Gustafson*, 279 N.W.2d 744, 757 (Iowa 1979). *O'Dell* is really a case about rescinding a previously burdensome premarital agreement. It does not apply here.

For these reasons, we hold that the partial revocation—or really amendment—of the premarital agreement that the parties executed in 2017 was invalid and unenforceable as contrary to Iowa Code sections 596.7 and 597.2.

**B. Other Issues.** The foregoing resolution makes it unnecessary for us to reach Elizabeth's second and third arguments on appeal. However, Eric's counterclaims are a separate matter. In those counterclaims, Eric asks that if the partial revocation agreement is invalidated, Elizabeth should be required to relinquish the benefits she received as a result thereof. Otherwise, she would be unjustly enriched.

The district court did not address the counterclaims because its disposition of the case did not require it to do so. We remand for further proceedings with respect to Eric's counterclaims.

**V. Conclusion.**

For the foregoing reasons, we reverse the district court's order upholding the 2017 partial revocation agreement between David Roberts and Elizabeth Roberts and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

All justices concur except Christensen, C.J., who takes no part.